NOTICE

Decision filed 08/18/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 130166-UB

NO. 5-13-0166

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 11-CF-1388 |
| | ) | |
| KENNY WICKS, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Vaughan specially concurred.

**ORDER**

¶ 1    *Held*:   Following our previous remand for the limited purpose of a proper *Batson* hearing in this case, we reverse the defendant's conviction and sentence, and remand for a new trial, because we conclude that the circuit court's ruling on limited remand was clearly erroneous. Following a thorough review of the sufficiency of the evidence presented at the defendant's previous trial, we conclude that principles of double jeopardy do not bar a retrial of the defendant.

¶ 2    The defendant, Kenny Wicks, appeals his conviction and sentence, after a trial by jury in the circuit court of St. Clair County, for first degree murder. The defendant raises four issues in this direct appeal, which follows our previous limited remand to the circuit court for proper proceedings pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). For the following reasons, we reverse the defendant's conviction and sentence, and remand for a new trial.

1

¶ 3                          I. BACKGROUND

¶ 4     On September 22, 2011, the defendant was charged, by criminal complaint, with first degree murder for his role in the shooting death of James Earl Rogers Jr. on June 13, 2007. The criminal complaint was thereafter superceded by a criminal indictment that made the same allegation. Prior to trial, the State filed a notice of intent to seek enhanced sentencing on the basis of the State's allegation that it would prove that the defendant personally discharged the firearm which proximately caused the death of Rogers. The State's filing noted that, if proven, the firearm enhancement would add, by operation of law, a minimum of 25 years of imprisonment to the sentence received by the defendant.

¶ 5     The case proceeded to trial, with the jury selection process taking place on the afternoon of January 28, 2013, following the resolution, that morning, of other pretrial matters. The potential jurors were questioned first by the trial judge, the Honorable Michael N. Cook, then by each of the parties. Following questioning, after the parties and the trial judge were outside the presence of the pool of potential jurors, each party exercised peremptory strikes and strikes for cause. Thereafter, the following colloquy occurred, which we note accurately summarized the contentions of the parties with regard to the peremptory strikes that had been used:

     "THE COURT: You had a motion, [defense counsel]?

     DEFENSE COUNSEL: Yeah. I want to have—I always—to protect the record, I would like to have a *Batson* challenge on this jury. The jury, of course, has one black person and eleven white people. And it's not a representative jury of St. Clair County. And it's— it possibly is not a representative jury for the trial of this case in which a black man goes on trial. I particularly place emphasis on the fact that juror number 12, Jonetta Watson, was struck—I guess was stricken by the State's Attorney's office for no cause or no reason. There was absolutely nothing that she said or implied or any associations or any work

                                    2

situations which would require anybody to strike her as a juror except the fact that she is black.

THE COURT: Thank you. State?

COUNSEL FOR THE STATE: Judge, for defense counsel to go towards a *Batson* challenge, I believe that there would have to be a finding of a pattern. There is no pattern because only one juror was struck by the State that was African American in race. However, one African American was struck by the defense, and it was not for cause. That would be seat 10, number 261, Patrice Howard. So we struck one peremptorily. He struck one peremptorily. And everybody else who was African American was stricken for cause. So I would ask the court to deny the motion at this time.

THE COURT: The State is correct. The defense counsel would—is required to show a pattern. And striking one juror does not rise to the level of a pattern. And as the State indicated, [defense counsel] used one of his peremptory challenges on an African American as well. The court denies the motion for the *Batson* challenge."

¶ 6 The following morning, January 29, 2013, the presentation of witnesses in the defendant's jury trial commenced. Of relevance to this appeal, Travon Brown testified that he was 17 years old at the time of the trial and was interviewed by police in 2007 about the murder. Brown testified that he told police that he saw two black men running into an apartment complex in Cahokia, then heard gunfire, then saw the two men run back to a green car and leave the area. On cross-examination, Brown testified that he could not identify the two men. He also testified that in 2007, he identified a car that "could be" the green car he had seen. A photograph of the car he identified in 2007 was entered into evidence as People's Exhibit 42.

¶ 7 Illinois State Police investigator Denis Janis testified about processing the scene of the murder. Janis did not see signs of a forced entry or of a struggle within the apartment. Inside an

3

unlocked safe within the apartment, Janis found "a green leafy substance," an empty digital scale box, and "a large sum of currency." Janis testified that a digital scale was found elsewhere in the apartment, and testified with regard to the large amount of blood and blood stains found near the victim's body. Janis subsequently attended the autopsy of the victim that was performed by Dr. Raj Nanduri. Janis testified that there was only one gunshot wound to the victim, in the victim's neck, and that Dr. Nanduri recovered bullet fragments from the victim's body. Janis testified that latent fingerprints were found on the coffee table near the victim, but Janis did not believe the fingerprints were "ever connected to any particular person." By stipulation of the parties, Dr. Nanduri's autopsy report was read into the record. Dr. Nanduri opined that the cause of the victim's death was a gunshot wound to the neck, with "[t]he track of the projectile" being "downwards, backwards, and slightly to the right."

¶ 8    The next witness to testify for the State was Demond Eckford. He testified that he was 29 years old, and that at the time of the trial, he was incarcerated in the St. Clair County jail, charged with first degree murder in the present case. He testified that he also faced charges, in a different case, of aggravated discharge of a firearm and unlawful use of a firearm. He testified that he was testifying pursuant to a cooperation agreement with the State. When asked to explain his understanding of the agreement, Eckford testified, "If I testify against [the defendant], my other charge will get dismissed and I'll get—my first degree murder will get dropped to a Class 1 [felony]." He believed the Class 1 felony would be for attempted armed robbery, and that he would be sentenced to 15 years in prison, with the requirement that he serve 50% of his sentence. He testified that the sentencing range if convicted of first degree murder was between 20 and 60 years, agreed that no one had asked him to state anything that was not true, and agreed that his agreement with the State required him to testify truthfully. He also agreed that his agreement with the State

4

required him to "potentially" testify in the case of another defendant, "Mr. Crumble," if that case went to trial. The cooperation agreement was verified by the defendant and entered into evidence.

¶ 9    Eckford then testified about the events of June 13, 2007, that led to the death of the victim. He testified that he and Dontez Crumble had known each other since junior high school. He testified that he and the defendant also had known each other since junior high school. Eckford testified that he considered himself closer as a friend to Crumble, but knew the defendant too. He testified that at approximately 6 or 7 p.m. on June 13, 2007, he and Crumble met and discussed their plan to rob the victim of "some marijuana" and of money "[i]f he had it." Eckford testified that they planned to rob him "with a gun," but did not have one. Eckford testified that Crumble told him that the defendant would have a gun. He testified that Crumble left to pick up the defendant, then returned with him. Eckford testified that the defendant was wearing "a white tee-shirt with some green checkerboard shorts and some green and white air force ones." Eckford did not see a gun. He testified that the defendant borrowed the defendant's girlfriend's car, which he earlier described as a green Bonneville. He testified that he drove the car, the defendant sat in the passenger seat, and Crumble sat in the back seat. When asked why he drove, Eckford testified, "Because I was from Cahokia so I kinda knew the streets to drive so we wouldn't get pulled over." He reiterated that he did not observe a gun in the defendant's possession but testified that he believed the defendant possessed one, based upon the fact that they were going to do the robbery. Eckford testified that he knew the victim sold marijuana out of his apartment, because he had been at the apartment one time before.

¶ 10    Eckford testified that when they arrived at the apartment complex, he stayed in the car with the engine running, while Crumble and the defendant left the car and went toward the victim's apartment. Approximately "three minutes" later, he heard a loud gunshot, and approximately one minute after that, Crumble and the defendant "came running to the car." The defendant had blood

5

on his neck and chest, and had a gun. Eckford described the two men as looking "shocked." Crumble did not have blood anywhere on him. Eckford testified that as the defendant got back into the car, the defendant "took off his shirt, and he opened the door with the shirt and put the shirt and the gun on top of his lap." He testified that he believed the defendant was trying to avoid getting fingerprints or blood on the car. The defendant told him to " 'drive, just drive,' " and Eckford asked what happened. Eckford testified that the defendant said, " 'I hope he's dead.' " He testified that the two men would not tell him what happened. He drove them back to Centreville, where they were staying, and once they reached the defendant's girlfriend's apartment, the defendant took off the remainder of his clothing and placed it all in a trash bag, while Crumble was "[j]ust quiet." After approximately 10 minutes, Eckford left and returned to his own apartment. He agreed that he had known a robbery was planned, but had not expected the victim to be killed.

¶ 11    Eckford testified that approximately one year after the murder, he was interviewed by Cahokia police. He testified that although he told the police most of the details about which he had just testified, he did not initially tell them about the plan to rob the victim. When asked, he reiterated that he had never been asked by the State to lie during his testimony. He testified that People's Exhibit 42—which was the photo of a green car that Travon Brown had told police "could be" the car he saw at the complex at the time of the murder—was in fact a photograph of the green Bonneville that belonged to the defendant's girlfriend and that Eckford drove to the complex on June 13, 2007. He testified that during the year between the murder and his interview with police, he did not discuss what happened with Crumble.

¶ 12    On cross-examination, defense counsel immediately suggested to Eckford that Eckford "had a long history of criminality and deliquency." The State objected and a sidebar, outside the presence of the jury, ensued. Defense counsel asked to see Eckford's criminal history, and the State responded that "none of those were admissible. They are not admissible. Those are

6

misdemeanors. They're not admissible. He should not be allowed to bring them in." Defense counsel responded that "[t]here's some resisting arrest." The State then reiterated that there were no felonies present in Eckford's history, and that the history did not involve any crimes of moral turpitude. Judge Cook ruled that defense counsel could "go into the felonies," but the State again noted that Eckford did not have any felonies in his history. Defense counsel suggested that "[r]esisting arrest is properly impeachable," a suggestion with which the State disagreed. Defense counsel then stated, "Resisting arrest and all that, that's all proper. He pled guilty to all that." The State again disagreed, and Judge Cook stated, "I'll let you bring in one resisting arrest." Defense counsel replied, "Okay." He did not make a record as to what other offenses he might have been referring to by "all that" or otherwise make a record with regard to what offenses he wished to bring in but had been denied permission to bring in.

¶ 13     After the sidebar, in the presence of the jury, defense counsel asked Eckford about his 2004 resisting arrest charge. He then attempted to ask Eckford about "three obstructing justice" charges, but the State objected. In another sidebar, defense counsel stated that he should be allowed to question Eckford about additional charges. Judge Cook stated, "I''ve already made my decision." Defense counsel again replied, "Okay." This time, however, he asked if he could "make an offer proof at a later time without waiving it?" Judge Cook replied, "Yes." Again in the presence of the jury, defense counsel asked Eckford how many charges were being dismissed in exchange for his cooperation agreement with the State. Eckford answered, "Two," but subsequently agreed that, in total, three charges were being dismissed. He also agreed that he did not seek out the police after the June 13, 2007, shooting, and only spoke to them after they found him. He further agreed that he did not originally tell the police about the plan to rob the victim, and agreed that he was presently charged with first degree murder, because he was involved in the robbery that led to the death of the victim. He denied that on the day of the murder, he had been at the victim's apartment earlier

7

in the day, smoking marijuana. He agreed that if Crumble said Eckford had been, Crumble would not be testifying truthfully.

¶ 14 Eckford also agreed that he participated "voluntarily" in the robbery and had expected to get some of the money and marijuana from the robbery. Defense counsel then questioned Eckford in detail about his earlier testimony as to the events, and timeline, of the robbery. Eckford testified consistently with his earlier testimony. He thereafter denied that he and Crumble came up with "a matching story" together. He testified that the defendant later told Eckford what happened in the victim's apartment. He testified that he could not remember if he told police that the defendant was the shooter, and could not remember if he told police that Crumble, as well as the defendant, had blood on him. He further testified that he could not remember if he told the police that he went into the defendant's girlfriend's apartment with the defendant and Crumble after the murder. He thereafter testified that he believed he did tell the police he went into the apartment, and believed it would be on his video-recorded statement to police. Defense counsel questioned Eckford about other purported inconsistencies between Eckford's testimony at trial and his earlier statement to police. He then questioned Eckford extensively, again, about the cooperation agreement with the State, and the possible penalties Eckford faced in the absence of the agreement, as well as about details of the robbery and murder.

¶ 15 Following Eckford's testimony, Thomas Gamboe Jr. testified for the State. Gamboe testified that he was an Illinois State Police forensic scientist with a specialty in firearm and tool mark examination. He testified that he examined the bullet fragments in this case and determined that the main part of the bullet was a .38-caliber fired bullet. He testified that it was possible that the bullet was fired from a semiautomatic pistol, but more likely was fired from a revolver, possibly a .357-revolver. He testified that no gun was presented to him as the possible weapon in this case. Thereafter, Jerry Zacheis testified that he was an Illinois State Police crime scene investigator, and

that on July 15, 2008, he was asked to process a green 1993 Pontiac Bonneville that had been discovered by police. He authenticated photographs of the car, which were then admitted into evidence. He agreed that the car was discovered approximately one year after the murder in question. He testified that the car "was in extremely poor condition," that "[i]t was very dirty," and that there were "ants crawling on the inside, cobwebs," as if "it had been sitting there for quite some time." He testified that he did not find blood in the car.

¶ 16    The court recessed the trial for the rest of the day. On the following morning, January 30, 2013, the trial resumed. Outside the presence of the jury, Judge Cook and counsel for the parties addressed administrative matters. Defense counsel made his offer of proof with regard to Eckford's criminal history, stating that he believed he should be able to ask about offenses related to (1) attempted resist and obstruction of a police officer, (2) resisting and obstructing a police officer, (3) obstructing service of process, and (4) possession of cannabis. When asked, he conceded that all of the offenses were misdemeanors. He concluded by stating, "So that would be my offer of proof that I would at least be able to include those charges which involved obstruction of justice or resisting a peace officer as part of the element of offenses that can be used to impeach with along with thefts, infamous crimes and felonies." Judge Cook noted that the previous day he had allowed defense counsel to attempt to attack Eckford's credibility with one of the misdemeanors, as well as with any felonies (of which there were none), and stated that he would stand by his previous ruling.

¶ 17    Thereafter, James Jones testified for the State that in June 2007 he was a detective sergeant with the Cahokia police and that he investigated the murder in this case. Jones testified that no shell casings were found in the apartment, which led him to believe that the murder weapon was a revolver, which would not have ejected shell casings the way a semiautomatic pistol would have. He testified that in June 2008, after a meeting with the victim's mother and a person brought by

9

the victim's mother to the meeting, police "began looking for" the defendant, Eckford, and Crumble. Crumble was located first and was interviewed by police on July 8, 2008. The defendant was then located and was interviewed by police on July 12, 2008. A DVD recording of the defendant's interview was authenticated by Jones, then played for the jury. Jones testified that after interviewing the defendant, police continued their investigation and located the vehicle they believed was used in the crime. On July 16, 2008, police located Eckford and interviewed him. Jones testified that Eckford was interviewed again on August 23, 2012.

¶ 18    On cross-examination, Jones agreed that Crumble at first denied involvement in the murder and asked police if they thought he was involved. He further agreed that, ultimately, Crumble was also charged with murder in this case. He also agreed that Crumble stated that the robbery was Eckford's idea, and that no physical evidence was found in the victim's apartment that linked the defendant, Eckford, or Crumble to the apartment. He agreed that many people were interviewed by police about the case. On redirect examination, Jones agreed that during Crumble's interview, Crumble implicated the defendant as the shooter in this case, with Crumble stating that the defendant "pulled the gun out and shot him and I ran."

¶ 19    The next witness to testify was Marni Fults, who testified that she was the records custodian for a local used car dealership. She testified that on June 12, 2007, the defendant filled out a credit application with the dealership, with Eckford listed as a "co-buyer," and with Eckford and Crumble also listed as references for the defendant. Thereafter, Zachary Kurtz testified that he was a corrections officer at the St. Clair County jail. He testified with regard to the procedures at the jail's law library for inmates. He testified that Kenneth Joffre was an inmate at the St. Clair County jail in 2012 and for a time was the jail's law librarian.

¶ 20    Kenneth Joffre then testified. He testified that he was presently serving, in the Illinois Department of Corrections, a three-year sentence for two counts of burglary, following a

conviction in St. Clair County. He testified that he also had prior felony convictions in Alabama for theft of property, possession of a forged instrument, and promoting prison contraband, as well as a prior burglary conviction in Illinois. He testified that while he was previously in prison he belonged to the Aryan Brotherhood and had tattoos that reflected that, including tattoos with a "[t]hree-leaf clover, swastika, shield, whatnot." He testified that he no longer belonged to the Aryan Brotherhood. He testified that while incarcerated in the St. Clair County jail from approximately April 2012 to August 1, 2012, he served as a law librarian at the jail. He testified that during that time he became acquainted with Demond Eckford, as well as with the defendant, who Joffre identified in court. Joffre testified that the defendant was trying to get a message to his "brother"—who Joffre identified as someone Joffre believed was named "Crumble"—and that the defendant asked Joffre to relay the message to Crumble, which Joffre did. Joffre testified that the defendant also told Joffre that the defendant was involved in a robbery and murder, and that the defendant was the shooter during the murder. He testified that the defendant told him the robbery involved "some pot," and told him that the victim was shot "in the neck or the head," although Joffre could not recall which. He testified that he did not volunteer this information to police, but that they contacted him and conducted a videotaped interview with him. When asked if during that interview, he said that he was "not fond of people of the black race," Joffre testified, "That I'm not sure of. I don't recall that." He again testified that he no longer belonged to the Aryan Brotherhood, and that even when he did, "color wasn't an issue." He testified that he never asked for a reduction in his current sentence in exchange for his testimony, but did ask to be transferred to a different prison, which did not result in a reduction of his sentence.

¶ 21    On cross-examination, Joffre testified extensively about his prior felony convictions and prison sentences, his prior alcohol and drug use and how that use led to many of his crimes and convictions, his tattoos, and his affiliation with the Aryan Brotherhood. He denied that the Aryan

11

Brotherhood was a racist or white supremacist gang, contending that the group would "[b]and together as a family. It's not—we weren't against nobody else at that time." He again testified that he could not recall saying that he was not fond of black people. He testified that during his stint as a law librarian, he was in the library, at different times, with both the defendant and Crumble. He could not recall Demond Eckford. He agreed that he had heard "hundreds" of stories of crimes from other inmates while incarcerated, and could not recall every detail of what the defendant told him in this case. A recording of his interview with police was played for the jury, after which Joffre conceded that he told police, during the interview, that he was not fond of black people. On redirect examination, Joffre reiterated that the defendant told Joffre that the defendant shot a man in the neck.

¶ 22    Dontez Crumble testified that he was presently charged with first degree murder in this case. He testified that he had entered into a cooperation agreement with the State. He testified that his understanding of the agreement was that if he testified truthfully in the defendant's case, the first degree murder charge would "be amended to" attempted armed robbery, for which he would be given a sentence of between 10 and 15 years, with the requirement that he serve 50% of his sentence. He agreed that under the first degree murder charge, he currently faced a sentence of between 20 and 60 years, with the requirement that he serve 100% of his sentence.

¶ 23    Crumble testified that on June 13, 2007, early in the day, he and the defendant hung out. He testified that he had known the defendant "[m]ost" of his life, and that he and the defendant were cousins, related by marriage. Crumble testified that he had known Eckford for approximately 14 years, and was better friends with the defendant than with Eckford. He testified that at some point that day, Eckford suggested that they rob the victim. Crumble testified that the suggestion resulted when Crumble asked Eckford where they could "get some marijuana," and Eckford mentioned that he had been at the victim's house earlier that day, and that the victim had "a lot"

12

of marijuana. Crumble testified that Eckford said it would be easy to rob the victim. He testified that the defendant had a gun, but that neither Crumble nor Eckford had one. He testified that the men borrowed a car from the defendant's "friend," and that Eckford offered to drive to the apartment complex in Cahokia. He identified a photograph of the green Pontiac Bonneville as the car they traveled in that evening. Crumble testified that he sat in the back seat, and that the defendant sat in the front seat on the passenger side.

¶ 24 Crumble testified that while he and the defendant were in the victim's apartment, the defendant suddenly pulled out the defendant's gun and said that they wanted all of the victim's marijuana. Crumble testified that he believed the victim saw the gun. He testified that the victim "tried to rush" the defendant, taking "maybe like three or four steps towards" the defendant, and that the defendant then "shot him." Crumble testified that he was "looking directly at them" when the defendant shot the victim. Crumble believed the bullet hit the victim "in his collar bone or something." He testified that there was "[b]lood everywhere," and that he looked at the defendant and then ran out of the apartment and to the car. He testified that the defendant's gun was a .357-revolver. He testified consistently with Eckford about the defendant removing his shirt when he reached the car, trying to wipe blood off of his face, and then placing his shirt and the revolver on his lap. Crumble testified that he and the defendant were in the victim's apartment for less than a minute, and did not take any marijuana, money, or anything else. When asked why, Crumble testified, "I mean once he shot him, I didn't want to touch anything." He testified that Eckford asked the men what happened, that Crumble told Eckford that the defendant shot the victim, and that the defendant told Eckford to just drive away. He testified that he did not know that the defendant was going to shoot the victim. With regard to his 2008 interviews with police, Crumble testified that he at first denied involvement in the incident, but then admitted that he was present at the apartment, and that it was "a robbery that had gone wrong." He testified that he told the truth

to the police because he believed he needed to take responsibility for his part in what happened. Crumble testified that he "[b]riefly" discussed his case with Joffre at the St. Clair County jail.

¶ 25    On cross-examination, Crumble denied that police "put a lot of pressure" on him when interviewing him, stating instead, "I had a lot of pressure already on me." He agreed that he would receive the benefits of his cooperation agreement with the State by testifying, but clarified that he had to testify truthfully to receive the benefits. He agreed that he did not approach the police about the crime, and only talked to them after they approached him. He agreed that during his initial denial of involvement in the crime, he was more concerned with himself than with the victim or the victim's family, but insisted that his trial testimony was truthful. Thereafter, defense counsel extensively questioned Crumble about the events of June 13, 2007, and Crumble reiterated, *inter alia*, that the defendant shot the victim.

¶ 26    At the conclusion of the trial, the jury found that the defendant was guilty of first degree murder, and the jury also found that the allegation that the defendant had personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement or death to another person was proven. Thereafter, Judge Cook sentenced the defendant to the minimum available sentence of 20 years of imprisonment on the conviction for first degree murder, with 25 more years added to the sentence by operation of law because of the firearm enhancement. The entire sentence of 45 years was to be served at 100%, and followed by 3 years of mandatory supervised release.

¶ 27    The defendant filed a timely appeal, in which he raised four issues. We declined to rule on three of those issues, because we concluded that with regard to the fourth issue, remand to the trial court for the limited purpose of conducting a legally adequate *Batson* hearing (see *Batson v. Kentucky*, 476 U.S. 79 (1986); see also *People v. Shaw*, 2014 IL App (4th) 121157) was required, to determine whether a *Batson* violation occurred in this case. *People v. Wicks*, 2020 IL App (5th)

14

130166-U, ¶ 13. We noted that the State, and Judge Cook, were incorrect in their contention that a pattern of discriminatory strikes was necessary for a viable *Batson* claim to exist, and that Judge Cook "relied on his misunderstanding of the law to short-circuit—in fact, to abruptly terminate— the process by which he was required to evaluate the defendant's claim." *Id*. We concluded that, "[a]s a result, the record is insufficient for this court to conduct a meaningful review of the defendant's *Batson* challenge," and therefore we remanded for proper *Batson* proceedings. *Id*.

¶ 28　　On remand, on August 20, 2020, the circuit court judge then presiding over the case, the Honorable Robert B. Haida,[1] held *Batson* proceedings. Therein, the same attorney who represented the State at trial—and who suggested to Judge Cook at trial that the defendant was required to show a pattern of strikes before the defendant could prove a *Batson* claim—appeared on behalf of the State. Private defense counsel—different from the defendant's counsel at trial—appeared on behalf of the defendant. Judge Haida began the hearing by stating that he did not believe that the transcript he had "reviewed" provided him with "a sufficient factual background to make any kind of ruling." He added that he was "open to suggestions on how counsel intends to proceed." Defense counsel stated, *inter alia*, "I think I can make a *prima facie* case for *** the first decision of the *Batson* analysis *** [a]nd if you agree, then we can move from there." Judge Haida agreed with this proposed procedure, as did the State.

---

[1]Information on St. Clair County's public website, of which this court may take judicial notice (see, *e.g.*, *Kopnick v. JL Woode Management Co.*, 2017 IL App (1st) 152054, ¶ 26), shows that Judge Haida was the state's attorney of St. Clair County from 1991 to 2010 (see "History of the Office" tab at https://www.co.st-clair.il.us/departments/states-attorney/about-us), which included the time of the 2007 murder in this case, as well as the time during which the defendant was identified as a suspect and interviewed by police in 2008. Judge Haida was no longer the state's attorney at the time the defendant was charged in this case on September 22, 2011. The defendant does not contend in this appeal that anything about Judge Haida's service as state's attorney between the time of the 2007 murder and the time Judge Haida left office in 2010 led Judge Haida to labor under a conflict of interest that made it inappropriate for him to preside, as a circuit court judge, over the *Batson* proceedings during the limited remand in this case.

15

¶ 29    Thereafter, defense counsel argued extensively with regard to the factors necessary for the defendant to make a *prima facie* case pursuant to *Batson* with regard to juror 222 at trial, who, as defense counsel noted, was in position 12 in the venire at trial. As he made his argument, the parties agreed that a total of 45 people were in the "panel" of potential jurors, and that of those 45, 4 "self-identified as African-American"—those in positions 11, 12, 15, and 16. Judge Haida noted that he was not present at the trial, and asked the State if it was willing to stipulate that the challenged juror in this case was black. The State agreed that it was willing to so stipulate. Defense counsel noted that of the four potential black jurors, one was struck for cause because she had a pending civil case, one was accepted by the parties and served on the jury, one was struck by the State for cause "on the grounds that she stated that she couldn't sign a verdict," and the final one— juror 222, the juror at issue for purposes of the *Batson* claim—was struck by peremptory challenge by the State. Defense counsel also pointed out, in the terms of a commonality analysis for his *prima facie* case, that not only was juror 222 black, but so were the defendant, the victim, and several witnesses, including the defendant's alleged co-conspirators. He also pointed out that one of the State's witnesses was a former member of the Aryan Brotherhood, which also contained "a racial component."

¶ 30    With regard to a comparative juror analysis for his *prima facie* case, defense counsel noted that "Juror 222 says nothing in the entirety of the *voir dire* process with the exception of saying her name and that she worked at J.C. Penney. There are other jurors who say just as little, but they were tendered." Judge Haida then opined that the defense was getting into the next stages of a *Batson* claim. After some discussion, the State stipulated that it exercised four peremptory challenges at the trial, and that one of those was against an African-American, juror 222. Judge Haida then permitted defense counsel to continue with his comparative juror analysis. Defense counsel noted that juror 222 "was a woman in her 20s," then added:

"There were at least two in this case white male jurors, juror 131 and juror *** 295 [who] were 29 and 24 [years old] respectively. They were both single. They were both employed, which is two other points of similarity with juror 222. Both of them were tendered by the State. They similarly—neither of them made any statements in response to questioning with the exception of one of them indicated that he was acquainted with some state or county employees who weren't involved in the case."

¶ 31     When asked, the State noted that one of the above white male potential jurors who was tendered by the State "gave a hobby of video gaming, which [juror 222] did not give any hobbies, even though requested to do so by [Judge Cook]." She added, "I did not ask her any questions myself." Judge Haida thereafter asked the parties if it was correct that, ultimately, after challenges for cause had been completed, there were two black potential jurors remaining, and the State used a peremptory challenge against one of those two jurors. The parties agreed that this was correct. Judge Haida subsequently concluded that the defendant had established his *prima facie* case for a *Batson* claim, despite the State's contention that the defendant had not. Because the State does not challenge on appeal Judge Haida's ruling with regard to the defendant's *prima facie* case, we need not discuss the arguments the State made at the hearing about this issue.

¶ 32     Judge Haida then moved to the second step in the *Batson* analysis, "to allow [the State] to articulate a race-neutral reason for the striking of Juror [222]." The State asked to proceed by way of an offer of proof, which Judge Haida allowed. The State then offered the following, which we quote in its entirety:

"Your Honor, I first would indicate to the Court and to defense counsel that I have no independent recollection of this process when I exercised a peremptory challenge against [juror 222]. I will tell the Court that I have looked at my notes. I have conferred with my co-counsel. She has no independent recollection. And her notes have not been

17

found. I went to my notes and found next to [juror 222], the words 'young, round face' and then a question mark, and then the words 'otherwise okay.' That is typically something that I put on my notes at the very beginning of jury selection if there is something that strikes me about a particular person.

For instance, she is listed as 25 years old. And normally if I use the word 'young,' that means I think she looks younger than that, not that she was lying about her age, but that she struck me as younger than that. If someone says that they're 65 on the form, but they look 82, it's not that I think they're lying about being 65, but they look like they have aged not as well as some 65 year olds.

So I would probably articulate this note as past recollection recorded and infer that there was a concern about her youth.

I went back through what she had said, and [defense counsel] is correct. She gave us next to nothing. She said nothing about having anyone that she was close to being in law enforcement. She said nothing about having anyone being—she was close to being a victim of a violent crime. She said nothing about jury service. The [*sic*] she said nothing about any pending lawsuits.

She said nothing until Judge Cook went down the rows and asked each juror to say their name and where they worked and where they lived and their hobbies, at which point she said her name, that she was a lifelong resident of East St. Louis, that she worked at J.C. Penney. And then Judge Cook said, '[D]o you have any hobbies?' And she said, '[N]o.'

I did not ask her any questions either, which normally if I don't have a specific reason to ask, I don't. I don't want to walk the tight rope of trying to intrude in someone's personal life and risk offending her as well as other people on the jury who think that I'm like picking on a juror.

18

I have looked back at my notes as to [the first white male potential juror referenced by defense counsel]. I also have the words 'young looking.' He is 24. She was 25. But I do have a few more comments in my notes about him worrying about paying his bills and his job and the fact that he had a family member who was in law enforcement, being his brother ***. And he does mention a hobby, which is video gaming.

As to [the second white male potential juror referenced by defense counsel], I have that he was a tenant of Rocky McDonald, that he could be fair and impartial despite that, and that he worked at Scott Air Force base.

I wish that I could provide more to the Court. I do not have an independent memory. I can tell this Court that I would not have done—exercised a strike against [juror 222] due to her race. And though I have no independent memory, it is my belief that it was her youth that concerned me. And that's all I can provide to the Court. I apologize."

¶ 33 Asked to respond, defense counsel noted, *inter alia*, that to the extent that the State was putting forward juror 222's youth as its race-neutral reason for excluding her, "there were other jurors who were similarly aged who were tendered and *** served." With regard to the fact that juror 222 did not list any hobbies when asked, defense counsel pointed out that "she was far from the only one who did" not list hobbies when asked. He pointed to examples, in the trial transcript, of other potential jurors who did not list hobbies when asked. Judge Haida asked if defense counsel was arguing that the race-neutral reason tendered by the State was pretextual, and defense counsel stated that he was. He reiterated that he had given examples of other jurors who were similarly situated to juror 222, but were white, who were chosen and who served on the jury.

¶ 34 Judge Haida thereafter stated that he wished to make a record for this court of his ruling. He noted that he was in "a very difficult situation," because he "wasn't there." He noted that because of the passage of time, there was "certainly understandably failing memory with regard to

some specifics that would have been going on in a trial lawyer's mind at the time." He then stated, "I can't find that merely because there were other jurors of similar age who were retained on the jury while this African American woman of a similar age was excused—I can't find that that is pretext." A discussion ensued over whether the defendant was required to show a "bad motive" on the part of the State. Judge Haida then recessed the hearing to allow the parties time for additional briefing related to that issue.

¶ 35 The parties filed their briefs, and the hearing resumed on October 8, 2020. At the hearing, defense counsel argued, *inter alia*, that because the State had no independent memory of why it exercised the strike against juror 222, the State had not provided a race-neutral explanation for the strike, but instead had provided only "a potential reason," not a certain one, for the State's actions. He added that even if the State's potential reasons were considered, they "were mirrored in other jurors," not only in juror 222, which meant that "the only possible result" was to find that the State's offered reason, even if deemed certain, was pretextual. Defense counsel also posited that he believed that to deny the defendant's *Batson* claim, the circuit court was required to first make a finding "that the tendered reason that the State gave for the strike was actually *** the reason for the strike," instead of allowing the State to prevail on the basis of a reason it offered as a potential reason, rather than as the actual reason.

¶ 36 In response, the State agreed that it was "absolutely true" that the State had "no independent recollection" of the reason for the strike. The State argued that it was relying on its "past recollection recorded together with the representation of a habit and history of the" State, but conceded that the State was aware of no precedent allowing for such. The State nevertheless argued "that the Court should take that as the reason, based on the representations of myself and that the juror's youth and apparent appearance looking younger than her stated age, as well as not getting

20

any information from her other than when spoken to" were race-neutral, nonpretextual reasons adequate to defeat the defendant's *Batson* claim.

¶ 37    Judge Haida again noted the problems in this case caused by the passage of time since the trial, positing that the lack of existing precedent to direct the court in this case was attributable to the fact that in most cases there probably existed "a more complete contemporaneous record" related to the peremptory strike in question. He acknowledged that the State "doesn't have a specific memory based upon the passage of time of what would stand as a race-neutral reason." He stated that based upon the state and federal precedent he had reviewed, he believed that he was required "to find that there is purposeful discriminatory intent in addition to there being the *prima facie* case." He stated that he could not find that the State "with discriminatory intent purposefully excluded the juror in question," and stated that he denied the defendant's *Batson* claim.

¶ 38    Defense counsel subsequently requested clarification of Judge Haida's ruling, asking "as to the State's tendered reason for the strike of juror 222, are you finding that that was the reason for the strike or not?" Judge Haida answered, "I'm not." He thereafter added, "I'm primarily basing my ruling on the demeanor—and it's referenced in the cases—the demeanor of the prosecutor and the manner in which based upon my review of the record and of [the State's] explanations that there was no purposeful discriminatory intent." He further added that he would file "a written order that coincide[d] with [his] oral pronouncement."

¶ 39    On October 30, 2020, Judge Haida filed his written order. He first noted that he had "considered trial transcripts, briefs, and arguments from counsel," and that he had conducted a hearing pursuant to *Batson*. He thereafter ruled that the defendant had made a *prima facie* showing that the State exercised its peremptory challenge to juror 222 on the basis of race. He noted that he had "received the State's articulation of a race-neutral reason for the peremptory challenge[,] and

21

[d]efendant's argument that the State's explanation is pretextual." He ruled that after "considering the demeanor of the trial prosecutor and the transcript of the jury selection," he concluded "that the peremptory challenge in question was not pretextual and was exercised without purposeful discriminatory intent." He therefore denied the defendant's *Batson* challenge. The defendant then asked this court to reinstate his prior appeal, and to allow him to file supplemental briefs addressing the proceedings on remand. This court reinstated the defendant's appeal, and allowed supplemental briefing by both parties with regard to the proceedings that occurred on remand. The supplemental briefing now has been completed.

¶ 40                                    II. ANALYSIS

¶ 41    Following the original and supplemental briefing in this case, four issues are presently before this court: (1) whether Judge Haida erred when, on limited remand, he denied the defendant's *Batson* claim, (2) whether Judge Cook erred, at trial, when he limited certain cross-examination of witness Demond Eckford, including with regard to Eckford's criminal history, on the basis that the offenses defense counsel wished to examine Eckford about were not proper ones for examination, (3) whether the evidence adduced at trial was sufficient to sustain the defendant's conviction, and (4) whether Judge Cook should have recused himself from presiding over the defendant's trial, and/or sentencing, because of Judge Cook's involvement in criminal activities at that time, as well as the duty, if any, of the State to inform the defendant, at the time of the defendant's trial and/or sentencing, of the State's knowledge of the investigation into Judge Cook's criminal activities.

¶ 42    We begin with Judge Haida's ruling following the proceedings on remand. As this court has recognized—and as we specifically noted in our disposition that remanded this case for a legally sufficient *Batson* hearing—there is a three-step process to evaluate claims of alleged discrimination on the basis of race during jury selection. *People v. Shaw*, 2014 IL App (4th)

22

121157, ¶ 17. The process was established by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986). *Id.* First, the defendant must make a *prima facie* showing that the State has exercised a peremptory challenge on the basis of race. *Id*. ¶ 18. As explained above, the State on appeal does not dispute that Judge Haida was correct in finding that the defendant satisfied this first step in the process. The second step in the process is for the State to attempt to articulate a race-neutral reason for striking the potential juror. *Id*. ¶ 19. If the State establishes a race-neutral reason for striking the potential juror, the defendant is given the opportunity to attempt to rebut the proffered reason as pretextual. *Id*. Thereafter, during the third step in the process, the trial judge is to determine whether the defendant has shown purposeful discrimination, in light of the submissions of the parties. *Id*. ¶ 20. To make this determination, the trial judge evaluates not only whether the demeanor of the State belies discriminatory intent, but also whether the demeanor of the potential juror can credibly be said to have exhibited the basis for the strike attributed to the potential juror by the State. *Id*. When a trial judge's ruling on a *Batson* claim is challenged on appeal, we will reverse the trial judge only if the ruling is clearly erroneous. See, *e.g.*, *People v. Bradshaw*, 2020 IL App (3d) 180027, ¶ 37. "A determination is clearly erroneous when a review of the entire record leaves the reviewing court with the 'definite and firm conviction that a mistake has been made.' " *Id.* (quoting *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43).

¶ 43    In this appeal, the defendant contends that once Judge Haida concluded that the defendant had made a *prima facie* showing that the State exercised a peremptory challenge on the basis of race, the State was required to articulate a race-neutral reason for striking juror 222, and the reason given by the State needed to be more than "a mere fact" about juror 222: it needed to demonstrate that juror 222 exhibited a "specific bias" related to the matter at trial. Noting that Illinois courts have required the State's reason to be "clear, legitimate, and trial-specific," the defendant contends that the State was unable to clearly state the reason for its strike of juror 222: the State, because it

23

had no independent recollection of the reason for making the strike, could only guess, based upon a self-described past pattern of practices, as to the reason, and even when it did so, it used speculative, equivocal language such as "presumably" and "could" to describe its possible motivations, rather than clear unequivocal language about why it struck juror 222. The defendant also posits that even if one were to allow the State's speculation to be accepted as the required "clear" reason for the strike, the age—or apparent youthful age—of juror 222 is a mere fact about juror 222, which is insufficient under existing precedent because the State never articulated what about juror 222's age concerned the State "such that it justified the strike." The defendant contends that "[b]y extrapolating from a note made at the beginning of *voir dire*, and by failing to enunciate what the 'concern' was, the State was requiring [Judge Haida] and this Court to speculate if age motivated the strike, and if so, further speculate as to why." He argues that the record demonstrates that the State never questioned juror 222 about any concerns about her age or youthfulness, or, for that matter, about anything else. He also points out, as he did in the proceedings on remand, that even if one accepts that age was the reason juror 222 was struck, other potential jurors of a similar age, who were white, were not struck for the same reason, including one who the State specifically indicated, in its notes, was "young looking." Further, the defendant contends that although the State attempted to explain accepting that juror because he mentioned having hobbies, whereas juror 222 did not, the State's notes specifically state that apart from looking young, juror 222 was "otherwise okay," which undercuts the State's belated attempt to claim that juror 222's failure to list hobbies may have played a role in the State's decision to strike her.

¶ 44 The defendant contends that as if the foregoing were not problematic enough, Judge Haida complicated matters even more. The defendant points out that Judge Haida specifically stated that he was not relying upon the reasons given by the State as possible motivations for the strike, and stated that instead, "I'm primarily basing my ruling on the demeanor—and it's referenced in the

24

cases—the demeanor of the prosecutor and the manner in which based upon my review of the record and of [the State's] explanations that there was no purposeful discriminatory intent." The defendant points out that existing precedent required Judge Haida to make a finding as to whether the State's proffered reason was pretextual, and that in the absence of such a finding, it was not proper to instead consider the State's demeanor at trial. He argues that once the State admitted that it could not provide the *actual*, rather than *speculative*, reason for the strike, existing precedent dictated that Judge Haida find that the defendant had met his burden under *Batson*.

¶ 45    We turn now to the State's response on appeal. With regard to providing even a rudimentary analysis of the facts and issues resulting from our limited remand for adequate *Batson* proceedings, the State's brief on appeal leaves much to be desired. Although the State cites general propositions of law related to *Batson* in its brief, and recounts many of the facts of this case, the entirety of the State's *analysis* in its supplemental brief is that (1) "the trial court's denial of defense counsel's *Batson* challenge to the State's use of a peremptory strike on Juror 222 *** was proper," and (2) "it cannot be said that, after examining the record as a whole, that the trial court's findings were clearly erroneous." The State does not respond at all to the defendant's specific and precise supplemental arguments, described above. Nevertheless, we decline to conclude that the State has forfeited consideration of the supplemental issue on appeal, and in the interest of justice, we choose to address the issue.

¶ 46    We first note that we recognize, and are sympathetic to, the difficult position in which Judge Haida found himself: conducting a *Batson* hearing seven years after a trial over which he did not preside. Had the State, at that trial, not incorrectly told Judge Cook that the defendant was required to show a pattern of discriminatory strikes in order for a viable *Batson* claim to exist, or had Judge Cook known the law and corrected the State, the defendant's detailed and specific *Batson* challenge could have been considered at a time at which, presumably, the State would have

25

been able to explain why it made the peremptory strike in question, and Judge Cook, presumably, would have been able to apply the law properly to evaluate the defendant's claim. Unfortunately, that did not happen.

¶ 47      We must emphasize, however, that this is not a case where the defendant contributed to the problem by, for example, failing to make a contemporaneous objection. As described in detail above, defense counsel at trial made a contemporaneous objection, and specifically identified the use of the peremptory strike to which he was objecting: the one directed at juror 222, who defense counsel identified by her name and her position as number 12 in the venire. Thus, while we have no reason to doubt the sincerity of the State's contention that it now has no independent recollection of why it exercised the strike, the State was put on notice at the time of trial that the defendant took issue with that particular strike, and the blame for failing to make adequate, definitive notes about why the strike was exercised can be attributed to no person or entity other than the State. We cannot overlook the fact that at trial, the State deflected the issue of its use of the strike by incorrectly stating to Judge Cook the law related to this issue. In essence, the State invited the error that was made by Judge Cook and that led to the limited remand in this case. We commend the State for honestly representing to Judge Haida on remand that it had no independent recollection of why it exercised the strike, but we reiterate that the State was in the best position to ensure at trial that the actual, rather than speculative, reason or reasons for the strike were contemporaneously and definitively recorded—either on the record, or in the State's own notes—but failed to do so.

¶ 48      Moreover, Judge Haida's difficult position notwithstanding, he was required to follow the law. As explained above, once a *prima facie* case of discrimination has been established, the State must attempt to articulate a race-neutral reason for its use of the peremptory strike in question. *Shaw*, 2014 IL App (4th) 121157, ¶¶ 18-19. Citing *Batson*, the Illinois Supreme Court has held

26

that "[a]lthough the State's explanations need not rise to the level justifying a challenge for cause, a mere assertion that the prosecutor acted in good faith or without a discriminatory motive will not suffice." *People v. Harris*, 129 Ill. 2d 123, 174 (1989). Again citing *Batson*, the *Harris* court noted the general proposition of law that "the State cannot rebut a *prima facie* case of discrimination by stating that it does not know why it exercised its peremptory challenges." *Id.* at 181. The defendant is correct in his assertion that, relying upon *Batson* and *Harris*, our colleagues in the First District held that the failure of the State to recall the specific reason that it exercised a peremptory challenge against even one potential juror requires reversal and remand for a new trial, even in situations where the State did provide race-neutral explanations for its peremptory challenges against other potential jurors. *People v. Charles*, 238 Ill. App. 3d 752, 757-58 (1992). As the *Charles* court noted, various other courts interpreting *Batson* have agreed, ruling that, *inter alia*, (1) "not knowing" why a strike was exercised is not the functional equivalent of providing a race-neutral explanation, (2) lack of recollection on the part of the State means that, as a matter of law, the State has failed to rebut the *prima facie* showing, and (3) only in pre-*Batson* cases has the Illinois Supreme Court allowed the State to use lack of recollection as an excuse to explain a peremptory challenge, presumably because prior to *Batson*, the State was not on notice that such an explanation would no longer be acceptable. *Id.* at 758-60. The *Charles* court specifically ruled that the State had failed to rebut the *prima facie* showing, and that reversal and remand was required. *Id.* at 760. The court did not continue a *Batson* analysis by moving to the third step in the *Batson* process.[2] *Id.*

---

[2]The third step, as explained above, is to determine whether the defendant has shown purposeful discrimination, in light of the submissions of the parties, with the trial judge making this determination by evaluating not only whether the demeanor of the State belies discriminatory intent, but also whether the demeanor of the potential juror can credibly be said to have exhibited the basis for the strike attributed to the potential juror by the State. *Shaw*, 2014 IL App (4th) 121157, ¶ 20.

¶ 49    In this case, the State unequivocally confirmed for Judge Haida, on multiple occasions, that the State had no independent recollection of why it exercised its strike. The fact that the State thereafter offered speculation for why it *might* have exercised the strike does not change the fact that, ultimately, the State could not say with *any* amount of precision or certainty the actual reason that it exercised the strike, because the State conceded that it did not know the actual reason. Therefore, the defendant is correct that pursuant to *Charles*, as well as the many cases cited therein, the State's concession should have ended Judge Haida's inquiry under the particular circumstances of this case, and that pursuant to that line of cases, it was clearly erroneous for him to proceed.

¶ 50    Nevertheless, notwithstanding the State's failure to rebut the *prima facie* showing—unchallenged on appeal—that he had already found the defendant had made, Judge Haida decided to ignore both the State's lack of recollection and its proferred speculation. Defense counsel specifically asked Judge Haida, "as to the State's tendered reason for the strike of juror 222, are you finding that that was the reason for the strike or not?" Judge Haida answered, "I'm not." He thereafter added, "I'm primarily basing my ruling on the demeanor—and it's referenced in the cases—the demeanor of the prosecutor and the manner in which based upon my review of the record and of [the State's] explanations that there was no purposeful discriminatory intent." First, as explained above, pursuant to *Batson*, the Illinois Supreme Court has held that "a mere assertion that the prosecutor acted in good faith or without a discriminatory motive will not suffice." *Harris*, 129 Ill. 2d at 174. Therefore, Judge Haida erred by basing his ruling in part on the State's pronouncement that it "would not have done—exercised a strike against [juror 222] due to her race." Second, that error notwithstanding, we are aware of no Illinois precedent—and the State has certainly provided none on appeal—that allows a trial judge essentially to entirely skip the second-step requirement that the State offer a race-neutral explanation, and to instead make a ruling based upon only the third step of the *Batson* analysis. Indeed, as noted above, the *Charles* court

28

specifically ruled that the State had failed to rebut the *prima facie* showing, and that reversal and remand was required, and the court did so without any consideration at all of the third step in the *Batson* process. 238 Ill. App. 3d at 760. We note as well that such an approach makes sense, because *inherent* in the third step is the requirement that the State has, during the second step, provided a clear and precise reason for exercising its strike, because it defies logic to contend that one can conduct a third-step evaluation of "whether the demeanor of the potential juror can credibly be said to have exhibited the basis for the strike attributed to the potential juror by the State" (see *Shaw*, 2014 IL App (4th) 121157, ¶ 20), if the State has failed to tell the court what that basis was, or if the State has offered speculation and the judge has, as here, rejected that speculation as a basis for the judge's ruling.

¶ 51     Moreover, even if we were to disagree with the *Charles* court's analysis, and choose not to follow it, we would still find that Judge Haida clearly erred in this case. For example, some jurisdictions (see, *e.g.*, *Harris v. Haeberlin*, 752 F.3d 1054, 1058-59 (6th Cir. 2014)) have taken the position that a *Batson* hearing always requires a three-step process, even when the prosecution cannot remember why it exercised a peremptory strike, and that during the third step *all* of the evidence produced during the prior steps is considered together. If we were to adopt such a position, and to therefore conclude that Judge Haida's decision to ignore the State's failure at the second step and to nevertheless proceed to the third step was proper, Judge Haida's ultimate conclusion in this case would fare no better. We again note that Judge Haida specifically made a record of the fact that he was not present at the trial, which made his job more difficult in this case: a point with which we sympathize. However, because he could not base his evaluation of the demeanor of the participants at trial on firsthand knowledge—either from memory or from his own notes at trial—Judge Haida could rely only upon the transcript from trial. We reiterate that, as described above, at the beginning of August 20, 2020, hearing, Judge Haida stated that he did not

believe that the transcript provided him with "a sufficient factual background to make any kind of ruling." The transcript, of course, had not changed by the time Judge Haida relied upon it to assess the State's demeanor at trial, and juror 222's demeanor at trial, to make his ruling that there was no discriminatory intent. The only thing that had changed was the fact that the State had admitted that it did not know the actual reason it exercised the strike of juror 222.

¶ 52 The record, viewed as a whole, provides no evidence from which one could conclude that there was no purposeful discriminatory intent on the part of the State. The State had no independent recollection of why it exercised the strike, and, as explained above, the State's bare assertion that it would not make a peremptory strike on the basis of race was not a legally sufficient basis upon which Judge Haida could rest his ruling. *Harris*, 129 Ill. 2d at 174. The State's proferred reasons for why it *might* have made the strike were equivocal and speculative, and were rejected outright by Judge Haida in his oral pronouncement from the bench. Furthermore, the State's behavior at trial does not support the inference that there was no purposeful discriminatory intent; to the contrary, the State's behavior at trial supports the opposite inference, because instead of dealing with the defendant's *Batson* challenge head-on, the State attempted to deflect the challenge by claiming, incorrectly, that Judge Cook was not required to address the challenge. Indeed, as explained above, the State's behavior at trial actively, assertively, and ultimately successfully, *prevented* a contemporaneous exploration by Judge Cook of whether the State was acting with purposeful discriminatory intent. In addition, the erroneous legal position taken by the State at trial also supports the rather troubling inference that because at trial the State incorrectly believed that a pattern of strikes had to be shown before a legally viable *Batson* claim could exist, the State also incorrectly believed at trial that it had every right to make *one* peremptory challenge on the basis of race alone. This is a position we flatly rejected in our disposition ordering the limited remand in this case and, in fact, was one of the reasons remand was required. See *Wicks*, 2020 IL App

30

(5th) 130166-U, ¶¶ 11, 13 ("one free discriminatory strike" rule is "not permissible because thereunder the State would always be able to exercise at least one peremptory strike in a discriminatory manner, without fear of being held to its constitutional responsibilities," in contravention of "*Batson* and its progeny, which recognize that the exclusion of even one potential juror on the basis of race is unconstitutional").

¶ 53 The only remaining basis we can imagine for Judge Haida's conclusion that the defendant had not met his burden of showing that the State acted with purposeful discriminatory intent was his personal subjective belief, based upon his observation of the State's behavior in other trials or other contexts, that there was no purposeful discriminatory intent. For us to construe this as the basis for Judge Haida's conclusion would be highly speculative, however, because he never stated that it was the basis, or that it played any part at all. Moreover, we believe that if the State's bare assertion that it would not make a peremptory strike on the basis of race was not a legally sufficient basis upon which Judge Haida could rest his ruling (see *Harris*, 129 Ill. 2d at 174), neither would be Judge Haida's subjective belief, based upon experiences outside of the record of this case, about whether race might have motivated the State's actions in this case seven years prior. Thus, the only relevant evidence in the record—the State's behavior at trial—thoroughly supports, and in no way rebuts, the defendant's claim that the State acted with purposeful discriminatory intent.

¶ 54 For the foregoing reasons, our review of the entire record leaves us with the definite and firm conviction that Judge Haida's denial of the defendant's *Batson* claim was based upon one or more mistakes of law. Accordingly, his ruling was clearly erroneous and must be reversed. See *Bradshaw*, 2020 IL App (3d) 180027, ¶ 37. This conclusion, however, does not end our inquiry. Because the defendant, in his original briefs, raised the question of the sufficiency of the evidence presented at trial, we must consider the defendant's claim to determine whether principles of

double jeopardy bar a retrial of the defendant.[3] See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial). We find that they do not. When a defendant challenges the sufficiency of the evidence used at trial to convict the defendant, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Gordon*, 2019 IL App (5th) 160455, ¶ 14. We will not reverse a criminal conviction unless the evidence presented at trial is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* ¶ 15. There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence properly before the trier of fact. *Id.* As we undertake our review of the evidence under the above standard, we are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant. See, *e.g.*, *People v. Loferski*, 235 Ill. App. 3d 675, 682 (1992). Viewed with these principles in mind, we conclude that the evidence presented at trial in this case—which is described

---

[3]In his supplemental briefs, the relief requested by the defendant is a new trial, rather than outright acquittal, which would suggest that the defendant concedes that the evidence at his first trial was sufficient to withstand a double jeopardy challenge. Nevertheless, we presume that the defendant did not intend to abandon the sufficiency of the evidence claim found in his original briefs, and therefore we address that claim.

in great detail above—was more than sufficient to sustain the defendant's conviction, and that there are no double jeopardy problems in this case.

¶ 55 We now turn briefly to the other two claims raised by the defendant in his original briefs. With regard to his contention that Judge Cook erred, at trial, when he limited certain cross-examination of witness Demond Eckford, including with regard to Eckford's criminal history, on the basis that the offenses defense counsel wished to examine Eckford about were not proper ones for examination, we do not believe this issue is likely to recur on remand. We note that this issue does not involve a particularly complicated area of the law. Should Eckford again testify, we trust the parties will have a clear understanding of the law with regard to which offenses of his may be examined, and even if the parties do not, we trust that the judge who presides over the trial will. We note as well that to the extent the parties believe there is controversy with regard to this point, they can address that with the judge prior to trial, rather than waiting until trial.

¶ 56 With regard to the defendant's final contention in his original briefs, we conclude that because Judge Cook will not be presiding over the new trial, all issues related to his criminal activities and their potential impact on this case are now moot. Accordingly, we decline to address them. Finally, as noted above, we previously ruled that we would take with this case the defendant's motion to supplement the record on appeal with documents related to Judge Cook's criminal activities. We hereby deny, as moot, that motion.

¶ 57 III. CONCLUSION

¶ 58 For the foregoing reasons, we reverse the defendant's conviction and sentence, and remand for a new trial.

¶ 59 Reversed and remanded.

33

¶ 60    JUSTICE VAUGHAN, specially concurring:

¶ 61    I specially concur to note my disagreement with the contention that a defendant's *Batson* claim is successful as a matter of law at the second step of the inquiry if the State fails to recall its specific reason for using a peremptory strike against a juror. Certainly, there is support for this contention in *People v. Charles*, 238 Ill. App. 3d 752, 757-58 (1992), and—as the majority notes— there is no contrary Illinois precedent.[4] The subsequent United States Supreme Court case, *Johnson v. California*, 545 U.S. 162 (2005), however, is controlling. See *Johnson v. Department of State Police*, 2020 IL 124213, ¶ 31 (decisions of the United States Supreme Court that concern federal law are binding on Illinois courts).

¶ 62    In *Johnson*, the Court rejected California's imposition of a preponderance of the evidence standard at the first *Batson* step. It explained that the standard was too onerous because "[t]he first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim." *Johnson*, 545 U.S. at 170-71. As such, the opponent of the strike need only produce evidence sufficient to draw an inference of discrimination at the first step. *Id.*

¶ 63    In rejecting the notion that its decision "inexplicably entitle[s] a defendant to judgment as a matter of law on the basis of nothing more than an inference [of] discrimination" when the State fails to respond to a *prima facie* case, the Court clarified that the trial court determines whether the

---

[4]While I make no opinion of whether such distinction is present here, I note that the First District— and federal authority—have distinguished the State's failure to assert any justification for use of a preemptory strike from the State's reconstruction of its reasoning based on circumstantial evidence. See *People v. Nunn*, 273 Ill. App. 3d 519, 524 (1995) (distinguished *Charles* on the basis that the State reconstructed its reason to strike a juror based on its review of the transcript of *voir dire*, briefs filed in the earlier appeal, and consultation with the prosecutor who tried the case); see also *Hardcastle v. Horn*, 368 F.3d 246, 260-61 (3d Cir. 2004); *Green v. Travis*, 414 F.3d 288, 301 (2d Cir. 2005); *Crittenden v. Ayers*, 624 F.3d 943, 957 (9th Cir. 2010); *Harris v. Haeberlin*, 752 F.3d 1054, 1059-60 (6th Cir. 2014); *United States v. Nicholson*, 885 F.2d 481, 483 (8th Cir. 1989).

opponent of the strike met the burden of persuasion to prove purposeful discrimination at the third step. *Id.* at 170-71. This burden " 'rests with, and never shifts from, the opponent of the strike.' " *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Although the State's failure to provide a justification for the strike supports an inference of discrimination, "the case does not end—it merely proceeds to step three." *Id.* at 171 n.6.

¶ 64    Accordingly, a lack of a response at the second stage is not dispositive of a *Batson* violation; rather, it is evidence to be considered at the third step. *Lark v. Secretary of Pennsylvania Department of Corrections*, 645 F.3d 596, 625 (3d Cir. 2011); *Yee v. Duncan*, 463 F.3d 893, 900 (9th Cir. 2006). To hold otherwise, allows the opponent of the strike to assert a successful *Batson* claim based upon a mere inference of discrimination and avoid its ultimate burden of persuasion to prove purposeful discrimination, a result explicitly rejected by the Court in *Johnson*. See *Johnson*, 545 U.S. at 170-71.

¶ 65    Nevertheless, for the reasons provided in the majority opinion, I agree that the *Batson* determination was clearly erroneous. Justice Haida—who was not the original trial judge—determined that the trial transcript failed to provide him with "a sufficient factual background to make any kind of ruling." He also rejected the State's offered justification for striking the juror. Instead, Justice Haida relied only on the State's bare assertion that it would not make a peremptory strike based on race, which is a legally insufficient basis upon which Judge Haida could rest his ruling. See *People v. Harris*, 129 Ill. 2d 123, 174 (1989). Moreover, as noted by my colleagues, the State's evasion of providing a justification when defendant objected at the original hearing and failure to memorialize its justification for striking juror 222, despite notice of defendant's objection, further supports the claims of discrimination raised in defendant's *prima facie* case. For these reasons, I specially concur.