2020 IL App (3d) 180027

Opinion filed December 8, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0027 Circuit No. 16-CF-214 |
| | ) | |
| KENDALL T. BRADSHAW, | ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Holdridge and McDade concurred in the judgment and opinion.
_____

**OPINION**

¶ 1        After a jury trial, defendant Kendall T. Bradshaw was convicted of unlawful possession with intent to deliver a controlled substance (720 ILCS 570/401(d)(i) (West 2016)) and sentenced to 15 years' imprisonment. He appeals, arguing that (1) defense counsel provided ineffective assistance when he failed to make a speedy trial demand, (2) the State's challenge to exclude an African-American juror constituted a *Batson* violation (see *Batson v. Kentucky*, 476 U.S. 79 (1986)), (3) the trial court erred in admitting prejudicial text messages and allowing a police officer to give his irrelevant expert opinion, and (4) the cause should be remanded for resentencing

because he was unlawfully sentenced. We agree with defendant's second contention of error and reverse and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        On March 16, 2016, the State charged defendant with unlawful possession with intent to deliver heroin and unlawful possession of heroin. At the time of his arrest, defendant had a pending case before the Peoria County circuit court for unlawful possession (case No. 16-CF-53). He pled guilty in that case on August 29, 2016, and was sentenced to two years in prison.[1]

¶ 4        A jury trial on the March 16 charges began on October 25, 2016. At the conclusion, the trial court declared a mistrial due to a deadlocked jury. A scheduling conference was held, and defense counsel asked for a continuance to discuss a plea offer with defendant.

¶ 5        On December 12, 2016, the case was continued to February 6, 2017, over defendant's objection. On February 6, the assistant state's attorney agreed to a continuance until March 2, 2017. On March 2, defense counsel sought a continuance to March 13 to present a motion *in limine*.

¶ 6        As a result of scheduling conflicts, defendant's motion was not heard until March 20, 2017. At the motion *in limine* hearing, defendant sought to exclude text messages recovered from a phone that allegedly belonged to him. He claimed that the messages on the phone were inadmissible because they were hearsay and lacked proper foundation. He also sought to exclude any mention of the search warrant that was executed at the time of his arrest. The trial court ruled that the text messages were inadmissible hearsay. The court also barred testimony as to the underlying basis for the warrant.

¶ 7        On March 27, 2017, the day of defendant's second trial, the State presented case law in support of a motion to reconsider the court's text message ruling. In the motion, the State argued

_____

[1]According to the presentence investigation report filed in this case, defendant was sentenced to a two-year term in case No. 16-CF-53 after pleading guilty to a Class 1 felony.

that a proper foundation for the text messages could be established through circumstantial evidence. The trial court overturned its prior ruling and denied defendant's motion *in limine* in its entirety. In response, defense counsel asked for a continuance to May 8, 2017, to prepare for trial, which the trial court granted.

¶ 8        Following a continuance due to docketing issues, defendant's second trial began on June 19, 2017. Officer Todd Leach was the first witness to testify. He stated that he knew defendant based on two prior controlled buys that law enforcement conducted. He stated that the controlled buys served as the probable cause basis for the search warrant issued in this case. Defense counsel immediately objected and asked for a mistrial. After a sidebar, the State joined in defendant's request, and the trial court declared a second mistrial.

¶ 9        The trial court conducted scheduling conferences on June 22 and August 3, 2017. On August 3, defendant requested a continuance based on the impending expiration of his two-year sentence in case No. 16-CF-53. Counsel informed the court that defendant's prison term was set to end "shortly." He stated that, once released, defendant believed he could post bond and be out of custody before going to trial in this case. The court granted the continuance and set a third trial for August 14, 2017. On that date, defendant rejected a plea offer, and trial was reset for October 30, 2017. Following a motion to reduce bond, which was denied, the case was continued and rescheduled for November 27.

¶ 10        *Voir dire* began, as scheduled, on November 27, 2017. During the selection process, veniremember Pizzaro Pickett, an African-American juror, asked to speak with the trial judge. In chambers, Pickett stated that the judge had previously represented him in a criminal case but noted that he could be fair to both parties. In his jury questionnaire, Pickett also revealed that he had prior criminal convictions.

¶ 11 Levar Washington, another African-American veniremember, stated that he was born and raised in Peoria and had been employed with Morton Industries for seven months. He had never served on a jury before but believed he could give defendant a fair trial. During *voir dire*, the prosecutor asked Washington two questions. She first inquired if he had served on a jury before, to which he answered, "No." She then asked him if missing work for a few days for jury duty would "cause any problems." Washington responded, "No. I'm getting paid for it."

¶ 12 After questioning the panel, the State struck Pickett and Washington, the only African-American veniremembers in the group. Defense counsel objected, claiming the prosecutor used the peremptory challenge to strike both jurors on the basis of race.

¶ 13 The trial court found that a *prima facie* case had been made for a *Batson* violation and conducted a brief hearing.In providing a race neutral reason for removing the potential jurors, the prosecutor explained that she struck the potential jurors because they were the only two panel members that had criminal backgrounds. Specifically, she stated that "[i]t just so happens that the two black males that were in my jury also happen to be the two people on my whole list of people that I know have criminal contacts." She then noted that Pickett had a list of criminal convictions and that Washington "has some criminal contacts and arrests, at least some ordinance violations."

¶ 14 The trial court found that a *Batson* violation did not occur regarding the State's removal of Pickett based on his documented criminal convictions. However, the court asked for further evidence in support of a race-neutral reason for dismissing Washington, emphasizing that criminal contacts was a "pretty minimal" reason to remove a juror. In response to the court's inquiry, the prosecutor stated, "I don't have LEADS [(Law Enforcement Agency Data System)] in front of me *** sometimes I just get a bad vibe for me. He wasn't all that warm and fussy [*sic*] for me." Defense counsel informed the court that he did not have the referenced LEADS information. He

also argued that "criminal contacts" was not a sufficient race-neutral reason because it would disproportionately eliminate many minorities as potential jurors.

¶ 15    Following further questions from the court, the prosecutor acknowledged that she did not personally review Washington's LEADS report. She stated that another assistant state's attorney in the office wrote notes next to Washington's name on her list of potential jurors. She stated that she did not have the notes in front of her, but she believed she exercised the peremptory challenge to excuse Washington based on arrests:

> "So normally I would have written down exactly what his were because I didn't look at it, I just saw the top sheet which she had made notes on, and that makes sense, and I know they were ordinance violations, I know arrests.
>
> I don't know—I didn't have time because she needed the same packet of information. I mean I suppose I could if—they're done in there. I could go try to get it back from her, but she's in the middle of picking a jury as well."

The court determined that it was unnecessary to retrieve the list. It found the prosecutor's statement that the criminal contacts were arrests was sufficient to support a race-neutral reason for using a peremptory challenge to excuse Washington and denied defendant's claim.

¶ 16    Defendant's third trial began on November 28, 2017. The evidence revealed that officers had a search warrant for defendant, a red Ford Escape, and a cell phone. They located defendant at a convenience store, wearing a black cap, sweats, and a black shirt. He was driving a red Ford Escape. As he left the parking lot, officers attempted to perform a traffic stop. Defendant did not pull over, and officers were unable to pursue the vehicle. After losing contact with the Escape, they communicated with other officers in the area as to the vehicle's last known direction of travel. Detectives nearby spotted a vehicle matching the description. They followed the vehicle down a

residential street but lost sight of it. When they turned their patrol car around, they saw a black male, identified in court as defendant, walking out of an alley. The description given over the radio matched the man they observed, so they detained him and waited for the officers with the search warrant to arrive.

¶ 17    Officers searched the area around the alley and found a red Ford Escape parked behind a house. Inside the car, they recovered a cell phone. The cell phone that was recovered had the same number as the cell phone number identified in the warrant. Near the house where the Escape was parked, underneath a downspout, they found a black hat, a key to the car, and seven "tear-offs" containing heroin.

¶ 18    Peoria police officer Brian Grice testified that he collected digital media from the cell phone by performing a forensic download. Grice identified 32 photos, which were mostly "selfies" of defendant, and 1420 text messages that he recovered from the phone. Both parties agreed to the admission of the photos. The text messages were admitted over defendant's objection and published to the jury.

¶ 19    Officer Matthew Miller testified as a narcotics expert for the State. He described drug terminology specific to Xanax, cannabis, cocaine, and heroin. Miller identified several of the text messages recovered from the cell phone as "drug speak." He interpreted the meaning of the terms used in the incoming and outgoing messages. He testified that, in general, the drug conversations involved requests by different individuals to purchase heroin from the owner of the cell phone.

¶ 20    At the conclusion of Miller's testimony, the State rested. Defendant moved for a directed verdict, which was denied, and defendant rested. The jury found defendant guilty of possession with intent to deliver heroin.

¶ 21    In his posttrial motion, defendant again argued that the trial court erred in denying his *Batson* challenge. As before, the State claimed that Washington had been properly excused

because he had several criminal contacts. The prosecutor stated that she did not recall the details, but she remembered that Washington had "multiple arrests" and "maybe a conviction of something more minor, like maybe a misdemeanor or something like that." The court ruled that the State provided a race-neutral reason and denied defendant's motion.

¶ 22 Following a sentencing hearing, the trial court sentenced defendant to 15 years in prison and three years of mandatory supervised release.

¶ 23 II. ANALYSIS

¶ 24 A. Ineffective Assistance of Counsel

¶ 25 Defendant first contends that he was denied the right to effective assistance of counsel because his attorney failed to allege a constitutional speedy trial violation after his mistrials.

¶ 26 To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *People v. Houston*, 226 Ill. 2d 135, 143 (2007) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Both prongs must be satisfied to prevail on a claim of ineffective assistance. *Id.* at 144-45. Counsel's failure to assert a speedy trial violation does not satisfy either prong of the *Strickland* analysis if there is no lawful basis for raising a speedy trial objection. *People v. Phipps*, 238 Ill. 2d 54, 65 (2010).

¶ 27 A defendant possesses both a statutory (725 ILCS 5/103-5(a) (West 2018)) and a constitutional right to a speedy trial (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8). The Illinois Supreme Court has held that after a mistrial, another full statutory period does not necessarily begin to run. *People v. Gilbert*, 24 Ill. 2d 201, 204 (1962). In determining whether a defendant's speedy trial rights have been violated after a mistrial, courts are concerned with the constitutional right to a speedy trial rather than the statutory timeline prescribed by the legislature. *People v. Bazzell*, 68 Ill. 2d 177, 182 (1977).

7

¶ 28     Although the constitutional right to a speedy trial cannot be defined in terms of an absolute standard of time, the period between mistrial and retrial must be reasonable. *Id.* Our supreme court has adopted the four-factor balancing test developed in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), for evaluating a "reasonable" period and resolving a constitutional speedy trial claim. The factors outlined in *Barker* are (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id.* No single factor is sufficient to conclude that a speedy trial violation occurred. *Id.* at 533. Nevertheless, "[t]he length of the delay is to some extent a triggering mechanism." *Id.* at 530. Unless there is some delay that is "presumptively prejudicial," no inquiry into the other factors is required. *Id.* Generally, a speedy trial inquiry is not "triggered" unless the delay approaches one year. *People v. Crane*, 195 Ill. 2d 42, 52-53 (2001).

¶ 29     In this case, the length of delay between the first mistrial and retrial was 236 days (8 months), and the length of delay between the second mistrial and retrial was 161 days (5 months). In either instance, the delay between mistrial and retrial falls well short of the one-year threshold for triggering a constitutional analysis. See *People v. Beard*, 271 Ill. App. 3d 320, 328 (1995) (229 days insufficient to trigger full analysis); *People v. Chambers*, 258 Ill. App. 3d 73, 80 (1994) (six month delay not presumptively prejudicial); but see *People v. Echols*, 2018 IL App (1st) 153156, ¶ 22 (295 days "sufficiently close" to the one-year threshold to require further examination); *People v. Wills*, 153 Ill. App. 3d 328, 336 (1987) (152 days sufficient to trigger consideration of remaining factors).

¶ 30     Even if we combine the delay between the two mistrials and find that the 13-month delay constitutes presumptive prejudice, that threshold finding does not imply that the delay actually prejudiced defendant. See *People v. Kaczmarek*, 207 Ill. 2d 288, 295 (2003).

8

¶ 31 Considering the other *Barker* factors, we conclude that no constitutional speedy trial violation occurred. The reasons for the delay from the first mistrial to the final retrial were reasonable. A review of the record shows that of the 397 days, 210 days were attributable to the State, 138 days were attributable to defendant, and 49 days were due to the court docket. Considering two mistrials, a pretrial motion *in limine*, and the need to accommodate other courtroom proceedings, none of the delays were excessive or unreasonable. Further, defendant failed to articulate specific prejudice other than his continued incarceration without a reduction in bond. Defendant pled guilty in case No 16-CF-53 on August 29, 2016, and was serving a 2-year sentence during most of these proceedings. Thus, his argument that he was subjected to undue incarceration does not demonstrate prejudice. Moreover, defendant has not asserted that the delay impaired his capacity to defend the charges or compromised counsel's ability to prepare for retrial in this case. See *Echols*, 2018 IL App (1st) 153156, ¶ 39 (delay of 295 days was not oppressive pretrial incarceration where defendant was also incarcerated on unrelated charges during the claimed delay and failed to allege specific prejudice); *Wills*, 153 Ill. App. 3d at 337 (defendant's constitutional right to a speedy trial was not violated by 152-day delay where defendant failed to demonstrate that his defense was impaired in any way); *People v. Daniels*, 76 Ill. App. 3d 646, 651 (1979) (constitutional speedy trial violation was not found where in-custody defendant did not articulate prejudice).

¶ 32 Defendant was not denied his constitutional right to a speedy trial, was not prejudiced by counsel's failure to raise the constitutional speedy trial issue, and was not denied effective assistance of counsel.

¶ 33                                        B. *Batson* Challenge

¶ 34 Defendant claims the trial court erred in denying his *Batson* challenge by accepting the State's justification for striking veniremember Washington as nondiscriminatory.

9

¶ 35   The United States Constitution forbids a prosecutor from using a peremptory challenge to excuse a venireperson solely based on race. See *Batson*, 476 U.S. at 85 ("racial discrimination in jury selection offends the Equal Protection Clause"). In *Batson*, the United States Supreme Court created a three-step process for evaluating whether the State improperly used its peremptory challenge to dismiss a potential juror. First, the defendant must make a *prima facie* showing that the State exercised a challenge on the basis of race. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). That is, defendant must produce sufficient evidence for the court to infer that discrimination has occurred. *Id.* Second, the State must provide a race-neutral reason for striking the venireperson in question. *Id*. at 363. Defendant then has an opportunity to rebut the State's explanation as pretextual. *Id.* Third, the court must determine whether defendant has shown that the State purposefully discriminated in excusing the venireperson. *Id.* at 363-64. At this step, the court weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the venireperson, and any claims by defendant that the proffered reasons are pretextual. *People v. Easley*, 192 Ill. 2d 307, 324 (2000). The court must then determine whether the defendant has met his or her burden of proving purposeful discrimination. *Id.* In reaching its decision, the court is required to "assess the genuineness of the State's explanation along with the State's credibility in offering the explanation." *People v. Martinez*, 335 Ill. App. 3d 844, 853 (2002).

¶ 36   At the second and third steps, Illinois courts have emphasized that the State's race-neutral explanation for its use of peremptory challenges must be clear, legitimate, and trial specific, as required by *Batson*. See *People v. Mitchell*, 228 Ill. App. 3d 167, 172 (1992); *People v. Cannon*, 227 Ill. App. 3d 551, 557 (1992); *People v. Lovelady*, 221 Ill. App. 3d 829, 838 (1991) (citing *Batson*, 476 U.S. at 97-98). Although the prosecutor's reasons need not rise to the level of a challenge for cause, an explanation that is not supported by the record does not qualify as a legitimate and trial-specific reason. *Mitchell*, 228 Ill. App. 3d at 172.

¶ 37      A trial court's ruling on a *Batson* claim will not be overturned unless is it clearly erroneous. *People v. Davis*, 233 Ill. 2d 244, 261 (2009). A determination is clearly erroneous when a review of the entire record leaves the reviewing court with the "definite and firm conviction that a mistake has been made." *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43 (citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991)).

¶ 38      Here, the trial court found that defendant had established a *prima facie* case of a *Batson* violation as to both Pickett and Washington. The State then provided a race-neutral reason for using a peremptory strike against Pickett, *i.e.*, his criminal history. The trial judge accepted that reason as a nondiscriminatory basis for his removal, noting Pickett had been represented by the judge in a past criminal case and admitted to criminal conduct on his juror questionnaire. That ruling has not been challenged on appeal. The only issue before this court is whether the trial court erred in finding that the State's explanation for striking Washington was race neutral and valid.

¶ 39      At the *Batson* hearing, the prosecutor provided two reasons for using a peremptory strike to dismiss Washington (1) his demeanor and (2) his criminal contacts. The trial court correctly determined that the first reason was not an adequate race-neutral reason because it was not supported by the record. In arguing that Washington's demeanor provided a nondiscriminatory basis for exercising a peremptory challenge, the prosecutor explained that her "bad vibe" stemmed from Washington's "terse" answers to questions during the jury selection process. The trial court found that the prosecutor's negative assessment of Washington's demeanor lacked credibility, noting that his responses were "the best answer[s] any of us would want to hear." We agree; we find nothing in Washington's responses to suggest that he would not be a fair and impartial juror in defendant's case. The State's explanation that Washington was dismissed for personality reasons lacked the clarity, legitimacy, and specificity required by *Batson*. See, *e.g.*, *People v.*

11

*Gaston*, 256 Ill. App. 3d 621, 622 (1993) (noting that exclusions on the basis of demeanor alone are "fraught with the potential for abuse and use as a subterfuge for racial discrimination").

¶ 40    Turning to the second reason, Washington's criminal contacts, we again find little in the record to overcome defendant's *prima facie* showing that the peremptory challenge was based on race. Although a prospective juror's criminal history is considered a race-neutral reason for excluding a venireperson (*Payne*, 2015 IL App (2d) 120856, ¶ 48), a prosecutor's statement of "criminal contacts" alone should not suffice to rebut defendant's *prima facie* case. Past criminal transgressions, without context, may have little, if any, impact on a venireperson's ability to serve, unless the prospective juror indicates that it would. This is particularly true here, where the State failed to demonstrate that Washington actually had been charged or convicted of any crime. The prosecutor's failure to clarify this issue at the posttrial hearing only bolstered defendant's argument that the State's reason for dismissing Washington was pretextual. Based on the record, no grounds exist for the prosecutor's conclusion that Washington had criminal contacts. Thus, the State failed to rebut defendant's *prima facie* showing that it excluded Washington based on race.

¶ 41    In light of the foregoing, we are left with the "definite and firm conviction" that the trial court made a mistake in determining that the State's reason for exercising a peremptory challenge to remove Washington was race-neutral. We therefore reverse defendant's conviction and remand for a new trial.

¶ 42    Because defendant's constitutional rights were violated during jury selection, it is unnecessary for us to address his remaining issues.

¶ 43    We noted that both the federal and state constitutions protect individuals from being twice placed in jeopardy for the same offense. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10. The prohibition against double jeopardy forbids a second trial if the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt in the initial proceeding. *People v. Taylor*,

12

76 Ill. 2d 289, 309 (1979). In this case, we find that the evidence was sufficient to convict but that defendant was convicted by a defective jury selection process. A new trial is required to correct the errors that deprived defendant of a fair trial, and because the evidence was not legally insufficient, remanding for another trial does not violate double jeopardy principles. See *People v. King*, 2020 IL 123926, ¶¶ 52-53 (where reviewing court determines that the evidence introduced at trial was legally sufficient to convict, a retrial is not barred by the double jeopardy clause).

¶ 44                                    III. CONCLUSION

¶ 45        The judgment of the circuit court of Peoria County is reversed and remanded for a new trial.

¶ 46        Reversed and remanded.

**No. 3-18-0027**

| | |
|---|---|
| **Cite as:** | *People v. Bradshaw*, 2020 IL App (3d) 180027 |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 16-CF-214; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Amber Hopkins-Reed, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |