**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190277-U

Order filed March 29, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0277 Circuit No. 16-CF-562 |
| | ) | |
| CHARLES R. SMITH JR., | ) ) | Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justice Hauptman concurred in the judgment.
Justice Lytton concurred in part and dissented in part.

**ORDER**

¶ 1     *Held*:   Evidence was sufficient to sustain defendant's conviction for unlawful possession of a weapon by a felon. Trial court did not err when it denied defendant's *Batson* challenge. Defendant forfeited claim of prosecutorial misconduct in opening statements and closing arguments and plain error review is not appropriate.

¶ 2     Defendant Charles R. Smith Jr. was convicted by a jury of unlawful possession of a weapon

by a felon and sentenced to a three-year term of imprisonment. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     Defendant was charged by indictment with one count of unlawful possession of a weapon by a felon. 720 ILCS 5/24-1.1(a) (West 2016). The charges arose from an investigatory traffic stop that occurred on December 28, 2016. Defendant was returning to his house after picking up his one-year-old daughter from her mother's house. He was stopped by Kankakee police investigator Steven Hunter, who was investigating a shooting that had taken place at a convenience store the prior week. The sports utility vehicle (SUV) defendant was driving had been at the store when the shooting took place. After stopping the SUV, Hunter called for backup and waited for their arrival. Hunter then approached the driver's side of the SUV and spoke to defendant, who asked if he could call his mother to pick up his daughter who was in the backseat. Hunter ordered defendant out of the SUV, saw a handgun wedged between the driver's seat and the center console, and arrested defendant.

¶ 5     Prior to trial, defendant moved *in limine* to bar any reference to the convenience store shooting, arguing the incident was prejudicial and inflammatory to him. In that incident, defendant had driven to the store in the SUV with an unidentified passenger. Two men left the store at the same time as defendant, and the passenger noticed that one of them was reaching into his pocket, presumably to grab a gun. The passenger grabbed his own gun and shot the other man, who fled. The wounded man later arrived at a hospital but would not cooperate with the police. The passenger's gun was not the gun that was recovered in the SUV at the investigatory stop. At a hearing on the *in limine* motion, the State argued that defendant was "a person of interest" on an "earlier incident" and "his vehicle was a vehicle of interest" in a prior incident under investigation. The defense agreed the SUV was a vehicle of interest but rejected the State's characterization of defendant as a person of interest. The trial court granted defendant's motion, limiting Hunter to describing that he stopped the SUV as a subject of a prior incident under investigation.

2

¶ 6    Jury selection ensued. The venire pool consisted of 14 potential jurors, three of whom were black, including Tamela Love-Fisher, Christopher Jackson and Chrystal Alfred. The State used peremptory challenges only on the three black veniremembers.

¶ 7    The first peremptory strike was against Love-Fisher. She informed the State during *voir dire* that she knew the defendant or his family in that she thought her son played football with the defendant. She said the knowledge would not create a problem for her or affect her ability to be fair. She also informed the court that her son had been accused of burglary 11 years earlier and that he was treated fairly by the process.

¶ 8    The State used a second peremptory strike against Jackson. He said he knew Hunter from the community. Jackson informed the court that he also knew defendant and his family members because he went to school with them. He did not think that familiarity would create a problem with his partiality. He did not feel he would be biased. Jackson indicated he could treat defendant's testimony the same as he treated testimony from other witnesses.

¶ 9    The third peremptory strike was used against Alfred. She informed the court that her son was convicted in Cook County at the age of 16 and had been in the Illinois Department of Corrections (IDOC) for the last 18 years. She said her son was treated fairly by the State and the police but a witness had been unfair. She stated her son's conviction and incarceration would not have any bearing on her ability to be fair as a juror.

¶ 10    After the third challenge, defendant raised a *Batson* claim, arguing the State's use of its peremptory challenges was racially motivated. The trial court concluded that defendant presented a *prima facie* case and required the State to provide race-neutral explanations for the peremptory strikes.

¶ 11   In defense of its use of a peremptory challenge to exclude Love-Fisher, the State argued that she knew defendant and/or his family and the State did not want to explore the connection further. The State commented that "we wanted to go ahead and err on the side of caution given the fact that she does in fact know the defendant through the fact that her son and his—and him were teammates at some point." As to striking Jackson, the State again said its use of the peremptory challenge was legitimate because Jackson knew the defendant and "knowing the—the family of the defendant the State wanted to err on the side of caution as to not putting him on a jury where he would have to explain to the family his decision if he were to decide to convict." Regarding Alfred, the State responded that Alfred said her son was not treated fairly and had been incarcerated for 18 years which would cause her bias against the State.

¶ 12   Defendant argued the State's reasons for the peremptory challenges were pretextual. The trial court disagreed and denied the *Batson* motion, finding the State offered race-neutral explanations for use of its peremptory challenges to exclude the three black veniremembers.

¶ 13   Opening statements took place. The State argued that there was "nothing routine about a traffic stop" and "[e]very single time the men and women who wear the blue uniform" make a stop, they face unknown situations, including how the subject of the stop feels about the police. The State ended its opening statement with the comment that defendant was not "a patriot exercising his second amendment right to bare [*sic*] arms." Rather, he was "a felon with a gun."

¶ 14   Hunter testified for the State. He was a Kankakee city detective on patrol on December 28, 2016, when he saw the SUV, which he knew was the subject of an ongoing investigation. He stopped the vehicle, radioed for assistance, and waited until backup arrived. When Kankakee police officers Lacie Zingre and Logan Anderson responded, Hunter approached the driver's side of the SUV. He saw defendant in the driver's seat and defendant's one-year-old daughter in the

4

backseat. He did not see defendant make any furtive movements. Hunter asked defendant to exit the vehicle and he did. At that point, Hunter noticed the grip of a handgun wedged between the driver's seat and the center console. The gun was positioned to the right of and lower than the seatbelt buckle. The gun was a gray Glock pistol. Hunter retrieved the gun, which process was documented at the scene and demonstrated at trial through photographs, including State's exhibit Nos. 4-8. Hunter testified that State's exhibit No. 4 depicted the gun as he initially saw it in plain view.

¶ 15 Zingre testified that she was an investigator on December 28, 2016, and responded with Anderson to a traffic stop assistance call from Hunter. Defendant was still in the SUV when she arrived and Hunter was speaking to him. She heard bits and pieces of the conversation. Defendant did not immediately exit the vehicle when requested by Hunter. Rather, defendant wanted to call his mother or his daughter's mother to pick up the child. At that point, no one had told defendant he was under arrest. After defendant exited the SUV, Hunter called out the code for "gun." Defendant was then placed in handcuffs.

¶ 16 Anderson, a Kankakee detective, testified he was working with Zingre on December 28, 2016, when they received Hunter's call for assistance. Upon their arrival at the traffic stop, Hunter approached the driver's side of the SUV. When Hunter asked defendant to exit the vehicle, defendant did not do so right away but asked to call his mother to pick up his daughter. Defendant was not under arrest at that time.

¶ 17 The parties stipulated that defendant had been convicted of a felony in 2009 in Kankakee County. The State rested. The defense moved for a directed verdict, which the trial court denied.

¶ 18 Defendant testified. Defendant, his two daughters, and their mother LaShonda, spent the Christmas holiday with LaShonda's brother in Bloomington, arriving there on December 23 and

5

returning home on Christmas afternoon, when they went to celebrate at the home of defendant's mother. On December 28, defendant drove his mother's SUV to pick up his daughter from LaShonda's house and was returning home when Hunter stopped him. Several family members shared the SUV, including defendant's cousin, father, sister, and his sister's boyfriend. He did not know the gun was in the vehicle. He had never seen the gun before, never touched it, did not know who owned it, and did not know how it ended up in the SUV.

¶ 19    The defense rested. Closing arguments took place. Defendant argued that there was no fingerprint or DNA evidence connecting him to the gun. In response, the State argued:

> "What would have been the argument when we go ahead and do the DNA and it turns out with it having something? Oh, he must have touched it when he was buckling his seatbelt. He didn't know it was there. He must have touched it. So what? Oh, he drives this car so maybe his dandruff fell on to the gun and that's why it's there, but he still doesn't know. So what? Yeah, there's no DNA. There's no fingerprints. You know what else there is? There's no one else who could possess this gun instead of— instead of that defendant."

¶ 20    The State described defendant's request to call someone to pick up his daughter as proof of guilt, arguing defendant made the request before Hunter found the gun and arrested defendant. The State surmised that defendant knew he would be arrested because the gun was in the vehicle. It proceeded as follows:

> "He walks out of the car after barking—oh, hold on a second. I need someone to care for my kid because I know I'm going with you guys, and they find the gun. This isn't a second seatbelt cover. That's a gun. That's what that is. And how does he know that that's a gun there? Because he knows he's going with the police. At what time does

6

he know that he's going to the police? Before they say you're under arrest. So how does this play out? 10-32, cuffs. That's the chronology you need to worry about because that chronology tells you that this defendant knows he's going with police before they said he was being arrested. That's the chronology that's important. That shows his mental state. That shows what he knows and he knows he's not getting out of this one."

¶ 21 The trial court instructed the jury, which retired to deliberate. Nearly three hours later, they sent a note asking, "What is reasonable doubt ***?" The trial court, after consulting with the parties, replied, "[N]o definition can be given. It is up to the jury to determine what constitutes reasonable doubt." The jury thereafter found defendant guilty.

¶ 22 Defendant filed a posttrial motion for a new trial and/or in arrest of judgment, arguing the trial court erred in denying his *Batson* claim. A hearing took place. Defendant again argued the peremptory strikes were race-based and the State's reasons were pretextual. The State argued that it was unknown whether the three potential jurors the State struck were black and that defendant did not establish a *prima facie* case of discrimination. The State presented the same reasons it challenged the three black veniremembers as it offered at the *Batson* hearing. It argued that defendant's connection to Love-Fisher's son as football teammates was concerning and would "influence" her. It did not want Jackson to have to explain the verdict to defendant's family. The State said that striking him was not race-based but rather based on "what is that relationship that he has with members of the defendant's family." In supporting its challenge to Alfred, the State pointed to her son's prior experience with the criminal justice system and the unfair witness. The State argued that Alfred said:

7

"[H]er being upset was because of a witness. It wasn't because of the State, it wasn't because of the court system. But here's the problem, Judge. The witness was relied on by the State when they decided to charge the case, when they decided to go forward with the case, when that case went through the judicial system and resulted in a conviction which her child has been sitting in prison for that extended period of time. So when she says that she only holds it against the witness, well, that witness started a ball of events that includes the State's Attorney's Office which ultimately filed charges based off of the crime that was committed, you know, and whatever—I don't know the specifics, Judge."

¶ 23 The trial court denied defendant's motion. A sentencing hearing took place and the trial court sentenced defendant to a three-year term of imprisonment. He timely appealed.

¶ 24                                II. ANALYSIS

¶ 25 Defendant raises three issues on appeal. First, he challenges whether the State proved him guilty beyond a reasonable doubt. Next, he argues the trial court erred when it denied his *Batson* claim. Third, defendant submits that the State committed prosecutorial misconduct in its opening statement and closing rebuttal argument.

¶ 26 We turn first to defendant's challenge to the sufficiency of the evidence. Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of unlawful possession of a weapon by a felon. He maintains the sole evidence the State offered was his proximity to the gun, which was insufficient to sustain his conviction.

¶ 27 The State must prove every element of an offense beyond a reasonable doubt. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Brown*, 2013 IL 114196, ¶ 48. In addressing a challenge to the sufficiency of the evidence, we consider

whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 28    "It is unlawful for a person to knowingly possess on or about his person *** any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony ***." 720 ILCS 5/24-1.1(a) (West 2016). To prove unlawful possession of a weapon by a felon, the State must establish the defendant knowingly possessed a firearm and that he had a prior felony conviction. *People v. Adams*, 388 Ill. App. 3d 762, 766 (2009). Possession may be actual or constructive. *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002). Actual possession requires the State to show that the defendant exercised "present personal dominion" over the gun such that he "exercises immediate and exclusive dominion or control" over it. *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). Mere proximity is insufficient to sustain actual possession. *Id.* at 81.

¶ 29    The State proves constructive possession when it demonstrates the defendant had knowledge of the presence of the gun and had immediate and exclusive control over the area in which it was found. *People v. Ingram*, 389 Ill. App. 3d 897, 899-900 (2009). A defendant's presence in the vehicle where a weapon is discovered, without more, is not enough to establish knowledge of the gun. *Id.* at 900. To establish possession was knowing, the court considers the following factors: (1) the weapon's visibility from the defendant's position; (2) the gun's size; (3) the time period the defendant had to view the gun; and (4) any gestures by the defendant to hide or retrieve the gun. *Bailey*, 333 Ill. App. 3d at 891-92. Other factors include whether defendant's actions showed consciousness of guilt, such as attempting to flee from the police. *People v. Williams*, 266 Ill. App. 3d 752, 760 (1994).

9

¶ 30    The State proved constructive possession. The first factor we look to determine whether the evidence was sufficient to sustain that finding is the visibility of the gun from the defendant's position. The gun was tucked between the driver's seat and the center console with the butt of the gun sticking up. Hunter said he saw the grip of the gun in plain view from his position outside the vehicle. The photographs submitted by the State show the gun in the vehicle as it was seen by Hunter. Hunter's testimony and the photographs establish the gun was in plain view and visible from defendant's position. The next factor is the gun's size. As Hunter testified, only the grip of the gun was visible but that portion of the gun was large enough for Hunter to identify it as a firearm from his viewpoint outside the vehicle. Hunter testified he was especially familiar with the type of gun and recognized it immediately because he carried the same gun. According to Hunter, the grip was "protruding in plain view."

¶ 31    The third factor is the time the defendant had to view the gun. The evidence established that defendant went to pick up his daughter from her mother's home and bring her to his mother's home. Although there were no facts offered as to the distance between houses or how long defendant had been driving the vehicle that morning, there was enough time for him to notice the gun. Hunter was able to identify it during the short duration of the investigative stop prior to defendant's arrest. A reasonable assumption was that defendant's trip to and from LaShonda's house was longer than the time Hunter spent at the driver's side window. The State did not establish the last factor, as there was no evidence that defendant made any furtive gestures or attempts to hide or retrieve the gun. However, the State offered defendant's requests to call his mother as consciousness of guilt, similar to an attempt to flee. Based on these facts, we conclude the State proved defendant's knowledge of the presence of the gun and that he had immediate and exclusive control over the area in which it was discovered.

10

¶ 32    In addition to proof of constructive possession, the State also offered into evidence a certified copy of defendant's prior conviction. We thus find the State proved beyond a reasonable doubt that defendant unlawfully possessed the firearm as a felon.

¶ 33    The second issue we consider is defendant's *Batson* claim. Defendant argues the trial court erred when it denied his *Batson* claim, pointing to the State's use of peremptory challenges to strike the only three black veniremembers. According to defendant, in defending its challenges to the potential jurors, the State mischaracterized their statements which in turn caused the court to improperly deny his *Batson* claim.

¶ 34    Courts use a three-step process to evaluate a *Batson* claim. *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986). In the first step, the defendant must establish a *prima facie* case that the State used its peremptory challenges in a discriminatory manner. *Id.* at 93-94. In the second step, the burden shifts to the State to offer a race-neutral basis for its strikes. *Id.* at 94. The State's reasons must be "clear, legitimate, and trial specific." *People v. Bradshaw*, 2020 IL App (3d) 180027, ¶ 36. The defense may then rebut the State's proffered reasons as pretextual. *People v. Davis*, 231 Ill. 2d 349, 363 (2008). The third step involves the court's determination whether the defendant has shown the State purposefully discriminated. *Id.* at 363. This court will not reverse a trial court's ruling on a *Batson* claim unless it was clearly erroneous. *Bradshaw*, 2020 IL App (3d) 180027, ¶ 37. "A determination is clearly erroneous when a review of the entire record leaves the reviewing court with the 'definite and firm conviction that a mistake has been made.' " *Id.* (quoting *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43).

¶ 35    The trial court found that the State's use of three peremptory challenges against the only three black veniremembers constituted *prima facie* evidence of discrimination. The State then proceeded to offer race-neutral explanations for the peremptory strikes. For both Love-Fisher and

11

Jackson, the State expressed its concern that they knew defendant and/or his family. Love-Fisher's son played football with the defendant. Jackson went to school with defendant's family members. According to the State, it was not worth the risk to accept the two jurors. It surmised that Love-Fisher could have been "influenced" by the connection with defendant and Jackson might have to explain a guilty verdict to defendant's family. When a potential juror indicates he or she is familiar with the defendant, the use of a peremptory challenge is not improper. See *People v. Brown*, 152 Ill. App. 3d 996, 1002-03 (1987) (finding peremptory strike against black venireperson who had seen defendant "in the taverns" sufficient to rebut inference of discrimination). Only one other member of the venire said he knew defendant. Cleveland Thomas, a nonblack retired police officer, who said he knew "the young man's family" and admitted he was pro-prosecution, was excused for cause by the court. The trial court did not err when it accepted the State's explanations for striking Love-Fisher and Jackson.

¶ 36 The State also points to the prior involvement of Love-Fisher's son in the criminal justice system as an additional reason for using a peremptory strike against her. Pam Pickett, a white juror, had a child involved in the criminal justice system as well. Pickett, however, did not know defendant or his family. Like Pickett, the third black venireperson, Alfred, did not know defendant or his family but also had a child involved in the criminal justice system. Her son was convicted at age 16 and was still serving his DOC sentence nearly 20 year later. Alfred said that the police and prosecutor treated her son fairly but a witness engaged in unfair conduct. She said that experience would not affect her ability to judge fairly in the instant case. The State argued that its use of a peremptory strike against her was based on Alfred's claim of an unfair witness, thus differentiating her from Pickett, who did not indicate that she experienced any unfairness in the justice system based on her child's involvement in it. Another nonblack, Kathleen Ruge, who, like

12

Pickett, was chosen for the jury, said she was stopped unfairly by the police. However, she further explained that the experience would not affect her ability to be fair and impartial. We note the distinction between a traffic stop and the incarceration of one's child in differentiating Alfred and Ruge. Both women stated their experiences would not affect their impartiality. Nevertheless, Ruge's negative interaction was the temporary detention of a traffic stop and presumably not life-altering, while Alfred's son remained in prison as a result of what she perceived was unfairness by a participant in the criminal justice system. *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 51 (differentiating situation of stricken veniremember from similar circumstances of seated jurors). We conclude that the State's reasons for using a peremptory strike against Alfred was not based on race. *People v. Thomas*, 266 Ill. App. 3d 914, 920 (1994) (fact that a venireperson's family member has been charged with a crime is a race-neutral reason to use a peremptory challenge).

¶ 37       Defendant maintains that the State should have inquired further into the responses from the black veniremembers. According to defendant, each of the excluded veniremembers indicated that they could be fair and impartial, despite their knowledge of the defendant, his family or their own family's experience with the criminal justice system. He submits that if the State was concerned about the veniremembers' responses, it should have inquired further and its failure to do so suggests discriminatory intent. See *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (" '[T]he State's failure to engage in any meaningful *voir dire* examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.' ") (quoting *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000)).

¶ 38       In assessing the validity of the State's race-neutral explanation, our focus is on "the *facial validity*" of the State's explanation. (Emphasis in original.) *People v. Munson*, 171 Ill. 2d 158, 174 (1996). The State's explanation does not need to be persuasive or plausible. *Id.* at 175. As discussed

13

above, the State offered race-neutral explanations for striking Love-Fisher, Jackson and Alfred. The State's reasons were valid on their face and not pretextual for racial discrimination. Accordingly, its use of the peremptory strikes did not violate Smith's right to a fair trial. We find the trial court did not err when it accepted the State's race-neutral reasons to exclude Love-Fisher, Jackson and Alfred.

¶ 39     The third and final issue is whether the State committed misconduct in its opening statement and closing rebuttal argument. Defendant submits that the State's opening statement and closing argument included racist code phrases and were designed to play on the jurors' implicit and explicit biases. He also points to the exclusion of the only three black people in the venire as further contributing to the State's racial misconduct. In addition, he further submits that the State mislead the jury on a key issue. According to defendant, the State's dog whistles to the jury's prejudices and other prosecutorial misconduct deprived him of a fair trial.

¶ 40     The State owes the defendant a duty of fairness throughout the trial and is responsible for safeguarding the constitutional rights of everyone, including a defendant. *People v. Rowjee*, 308 Ill. App. 3d 179, 185 (1999). An opening statement is designed to give the jurors an overview of what the parties expect the evidence will prove. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). A closing argument allows the parties to review and discuss the evidence presented, apply the law, and " 'argue why the evidence and law compel a favorable verdict.' " *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (quoting T. Mauet & W. Wolfson, Trial Evidence 439 (2d ed. 2001)). Counsel is afforded wide latitude in closing argument and the proper scope includes argument and statements based on facts in evidence or reasonable inferences from the evidence. *People v. Crawford*, 343 Ill. App. 3d 1050, 1058 (2003). The introduction of race into the State's arguments is not permissible. *People v. Marshall,* 2013 IL App (5th) 110430, ¶ 13.

14

¶ 41    Defendant did not object to the State's comments or raise the issue in a posttrial motion but seeks plain error review. The plain error doctrine allows a reviewing court to consider an unpreserved error when (1) the evidence was closely balanced and the error threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Before plain error review may be employed under either prong, there must be clear or obvious error. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 42    We begin with an analysis of whether clear or obvious error occurred. We find no error. In the State's opening statement, the prosecutor did not mention race. He did not refer to the Black Lives Matter or the Blue Lives Matter movements, contrary to defendant's assertion. The prosecutor's comments regarding the uncertainty police officers face when they approach a stopped vehicle apply regardless of the race of the driver. Moreover, while the defense asserts that the State's use of the word, "patriot" aligns with whites, the State's use of a "felon with a gun" speaks more to defendant's status as a citizen barred from possessing a firearm than to a suggestion or stereotype regarding his race.

¶ 43    We also disagree with defendant's interpretation of the State's closing remarks. Defendant maintains the State continued its improper racial framework in statements in rebuttal with deliberate misrepresentations of the evidence, use of the motion *in limine* ruling against him, and improperly commenting about the fingerprint evidence with facts not presented, which combined with the alleged *Batson* errors, served to deprive him of a fair trial.

¶ 44    We reject defendant's claim that the State misrepresented the evidence and used the motion *in limine* ruling as a weapon against him. According to defendant, the State presented his request

15

to call his mother to pick up his daughter as consciousness of guilt when the State was aware the police wanted to interview defendant about the convenience store shooting. He argues the motion *in limine* prevented defendant from offering proof that his belief of an impending arrest or interview was due to his involvement with the shooting and not consciousness of guilt. However, defendant offers no evidence that Hunter intended to interview him immediately or that Hunter would require defendant to accompany him to the police station at that time. Hunter, Zingre and Logan all testified that defendant sought a ride for his daughter prior to discovery of the gun and defendant's subsequent arrest. We consider that the prosecutor's comments were a reasonable inference from the evidence.

¶ 45          Defendant next argues that the State's comments regarding the lack of fingerprint evidence and its conjecture that if fingerprint evidence had been discovered, the defense would have argued it did not implicate defendant. These comments were based on facts that were not in evidence and were improper. Nevertheless, the trial court instructed the jury that it was to disregard any rebuttal argument that was not based on the facts. *People v. Kopczick*, 312 Ill. App. 3d 843, 851 (2000). ("Improper prosecutorial remarks can be cured by an instruction to the jury to disregard argument not based on the evidence and to consider instead only the evidence presented to it."). We have no reason to believe the jury did not follow the court's limiting instruction. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103 ("It is presumed that jurors follow the instructions provided by the trial court").

¶ 46          Because we conclude there was no error in the State's opening statement and closing argument, we find the State did not commit clear or obvious error and plain error review is not warranted. Accordingly, defendant has forfeited this issue on appeal. Even if we were to conclude the State's comments amounted to clear or obvious error, plain error review would not change the

16

outcome. In this case, the evidence was not closely balanced. Defendant maintains the case amounted to a credibility determination as to whether he knew the gun was in the vehicle. The gun was found wedged in between the driver's seat and the center console, next to the seatbelt buckle and within defendant's sight and reach. The State presented the factors necessary to establish defendant's knowledge of the gun. Defendant's denial of knowledge does not result in a credibility determination. Because the evidence was not closely balanced, first prong plain error review is not warranted. Review under the second prong is not warranted either. Second prong review is limited to structural errors so serious as to affect the fairness of the trial and challenge the integrity of the judicial process. There were no such errors here.

¶ 47                                              III. CONCLUSION

¶ 48        For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

¶ 49        Affirmed.

¶ 50        JUSTICE LYTTON, concurring in part and dissenting in part.

¶ 51        I concur with the majority's conclusions that the evidence was sufficient to sustain defendant's conviction and that defendant forfeited his claim of prosecutorial misconduct. However, I disagree with the majority's finding that the trial court properly rejected defendant's *Batson* challenge because I am left with the definite and firm conviction that the State failed to overcome defendant's *prima facie* showing that one or more of the State's peremptory challenges were based on race.

¶ 52        When faced with a *Batson* challenge, the role of the trial court, and subsequently this court, is not to accept at face value the race-neutral reasons proffered by the State for striking black potential jurors. See *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006); see also *Miller-El*

17

*v. Dretke*, 545 U.S. 231, 252 (2005) ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis."). We cannot give rubber-stamp approval to the State's offered nonracial explanations. See *People v. Davis,* 345 Ill. App. 3d 901, 911 (2004). Rather, we must evaluate the record as a whole and consider each explanation within the context of the trial because " '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.' " *Hernandez v. New York,* 500 U.S. 352, 363 (1991) (quoting *Washington v. Davis,* 426 U.S. 229, 242 (1976)); *see also Miller-El,* 545 U.S. at 239 (noting that *Batson* requires inquiry into " 'the totality of the relevant facts' ") (quoting *Batson,* 476 U.S. at 94, 96)).

¶ 53     The " 'totality of the relevant facts' " includes the prosecutor's statements about his jury selection strategies and his explanations for striking minority jurors. See *Hernandez,* 500 U.S. at 363 (quoting *Davis,* 426 U.S. at 242). Relevant facts also include the characteristics of the jurors the State did not challenge. See *Miller-El*, 545 U.S. at 241. Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred. See *id.*; *Snyder v. Louisiana*, 552 U.S. 472, 483-484 (2008). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El*, 545 U.S. at 241; see also *People v. Mack*, 128 Ill. 2d 231, 239 (1989) ("The State's explanation for the exclusion of a black venireman cannot be considered race neutral *** if the State failed to exclude white veniremen having the same or similar characteristic ***."). Black and non-black potential jurors only have to be similarly situated, not identical, for a comparison to be probative of discriminatory intent. See *Miller-El*, 545 U.S. at 247, n.6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly

identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.")

¶ 54    In addition to comparing prospective white and non-white jurors, other evidence may tend to show that a race-neutral reason offered by the State is a sham and a pretext for discrimination. Such evidence includes (1) the prosecutor making factually inaccurate statements about black prospective jurors (*Flowers v. Mississippi*, 139 S. Ct. 2228, 2250 (2019)), and (2) the "State's failure to engage in any meaningful *voir dire* examination on a subject the State alleges it is concerned about" (*Miller-El*, 545 U.S. at 246 (quoting *Ex Parte Travis*, 776 So.2d 874, 881 (Ala. 2000)); see also *People v. Pecor*, 286 Ill. App. 3d 71, 79 (1996) (prosecutor's failure to ask additional questions of potential jurors who are excluded is a "factor to be considered by the trial court in evaluating the legitimacy of the State's [race-neutral] explanation").

¶ 55    To establish a *Batson* violation, the defendant need not prove that every non-white potential juror was improperly excused from the jury by the State. The exclusion of even one minority venireperson because of race is unconstitutional and requires reversal of the defendant's conviction. See *People v. Andrews,* 155 Ill. 2d 286, 294 (1993) (citing *People v. Harris,* 129 Ill. 2d 123, 175 (1989)).

¶ 56    Here, a comparison of two white jurors, Pickett and Ruge, with a black potential juror, Alfred, establishes that the State's reasons for striking Alfred were a sham and a pretext for racial discrimination. During *voir dire*, Pickett and Alfred provided nearly identical answers to all questions. Both denied knowing any witnesses, defendant or any member of his family; neither had served on a jury in a criminal case before; neither had heard anything about the case before; neither had a relative or good friend in law enforcement; both agreed that they

would not automatically give greater weight to the testimony of a police officer than other witnesses; both understood and accepted that the defendant is presumed innocent of the charges against him, that the defendant must be proven guilty beyond a reasonable doubt, that the defendant is not required to offer evidence on his behalf, and that the defendant's decision not to testify cannot be held against him; both felt they could be fair and impartial jurors, and both had children who had been accused of a crime. Alfred stated that her son had been convicted of assault 18 years earlier and was still serving time, and Pickett stated that her daughter had been charged with DUI and theft approximately 10 years earlier. Their answers diverged only when they were asked whether they believed their children had been "treated fairly" with respect to the criminal charges against them. Alfred stated that she believed her son had been treated "unfairly" by a witness but treated "fairly" by the police and prosecutor. Pickett believed her daughter had been treated "fairly" by everyone involved.

¶ 57    In striking Alfred, the prosecutor explained that he did so because she had an incarcerated family member whom she believed was treated unfairly. Striking a venireperson who has a family member charged with a crime is a race neutral ground for exercising a challenge. See *People v. Thomas*, 266 Ill. App. 3d 914, 920 (1994) (citing *People v. Hooper*, 133 Ill. 2d 469 (1989); *People v. Powell*, 224 Ill. App. 3d 127 (1991)). However, the State did not excuse Pickett, who also had a family member charged with a crime. The only difference between Pickett and Alfred (other than their races) was that Alfred believed her son had been treated "unfairly," while Pickett believed her child had been treated "fairly." However, upon closer inspection, these varying answers do not justify the State's striking of Alfred. A potential juror's belief that a family member has been treated unfairly by police or a prosecutor is a race-neutral reason to excuse a juror. See *Roberts v. State*, 651 S.E.2d 689, 694 (Ga. 2007); *Young*

20

*v. State*, 744 So. 2d 1077, 1084 (Fla. Ct. App. 1999). However, Alfred testified that her son was treated fairly by the police and the prosecutor but treated unfairly by a witness. I have found no authority supporting the exclusion of a potential juror on such a basis. Therefore, I would find the State failed to set forth a race-neutral reason for excluding Alfred.

¶ 58     My conclusion is bolstered by a comparison of Alfred with another white juror, Ruge. Again, both women provided answers nearly identical to each other during *voir dire*. Their answers diverged only on two topics: whether they had a family member accused of a crime and whether they had ever been pulled over by police. While Alfred's son was convicted of assault, Ruge said she had no family members accused of a crime. Additionally, Ruge indicated she had been pulled over by police while Alfred did not. Ruge stated that she thought she was treated unfairly by police when she was pulled over. A potential juror's belief that she has been treated unfairly by police is a race-neutral basis to exclude a juror. See *State v. Jackson,* 896 A.2d 137, 144 (Conn. App. Ct. 2006); *McLester v. State*, 547 S.E.2d 709, 713 (Ga. App. Ct. 2001). However, the State did not excuse Ruge, a white juror.

¶ 59     "Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government." *State v. Smith,* 222 Conn. 1, 14 (1992). In this case, a potential juror's negative experience with police would have been especially troubling to the State because nearly all the State's witnesses were police officers. That the State did not strike a white juror who believed she was treated unfairly by police but struck a black potential who harbored no bad feelings of the police or prosecutors lends support to my conclusion that the State's striking of Alfred was not race neutral and that the prosecutor's stated reasons were pretextual.

21

¶ 60    In addition, the prosecutor's striking of the only other black potential jurors, Jackson and Love-Fisher, and his reasons for doing so support my conclusion that the trial court erred in rejecting defendant's *Batson* challenge. During *voir dire*, Love-Fisher testified that she thought she knew defendant because he played football with her son. She stated that she could still be a fair juror and would not favor either side. Love-Fisher also testified that her son had been accused of burglary 11 years earlier. She believed her son had been treated fairly with respect to that situation. Jackson stated that he knew Officer Hunter, as well as defendant's "family members." Jackson also stated that he saw defendant "around." When asked by the court how well he knew defendant's family members, Jackson stated they "[w]ent to school together." Jackson stated that he would be able to be impartial and unbiased despite knowing defendant's family.

¶ 61    In explaining his decision to strike Love-Fisher from the jury, the prosecutor stated that he excused her for two reasons: (1) her son played football with the defendant, and (2) her son had been accused of a crime. The prosecutor further explained: "[W]e did not explore the extent of how well she knew the defendant, but we wanted to go ahead and err on the side of caution given the fact that she does in fact know the defendant through the fact that her son *** and him were teammates at some point." With respect to Jackson, the prosecutor stated that he excused him because "he too stated that he knew the defendant" and "he went to school with the family members of the defendant." The prosecutor explained: "[T]he State wanted to err on the side of caution as to not putting him on a jury where he would have to explain to the family his decision if he were to decide to convict."

¶ 62    The prosecutor's stated reasons for striking Love-Fisher and Jackson and are insufficient to overcome the presumption that his strikes were race-based for several reasons. First, as

22

explained above, having a family member accused of a crime, as Love-Fisher did here, was not a valid excuse for excusing her from the jury because Pickett, a non-white juror, had a child accused of a crime and the State did not strike her from the jury. Like Pickett, Love-Fisher believed her son had been treated fairly, so her situation is indistinguishable from Pickett's in that respect. That the prosecutor provided that reason to justify excusing Love-Fisher from the jury when that reason applied equally to a white juror who was not excused shows that reason was pretextual and the real reason for challenging Love-Fisher was racially motivated. See *People v. Randall*, 283 Ill. App. 3d 1019, 1029 (1996) (citing *People v. Mack*, 128 Ill. 2d at 239).

¶ 63    Furthermore, the prosecutor misstated Jackson's testimony to the court when he said that Jackson not only knew defendant's family but also the defendant. Jackson never said he knew defendant. He stated that he knew "defendant's family." The prosecutor's misrepresentation suggests that his race-neutral excuse was a sham. See *Flowers*, 139 S. Ct. at 2250.

¶ 64    Finally, the prosecutor failed to engage in any meaningful questioning of either Love-Fisher or Jackson to determine how well they knew defendant or his family, calling into question the legitimacy of the prosecutor's stated reasons for striking them. See *Miller-El*, 545 U.S. at 246. In this case, the prosecutor stated that he chose to "err on the side of caution" by striking Jackson and Love-Fisher. This statement suggests that the State could have obtained additional information from Jackson and Love-Fisher but chose not to. A prosecutor's decision to strike venirepersons based on a lack of information must be closely scrutinized because such an explanation "can be easily utilized as a pretext for discriminatory challenges." *People v. Harris*, 129 Ill. 2d 123, 188 (1989); *People v. Smith*, 236 Ill. App. 3d 812, 815 (1992). Courts, in evaluating such explanations, should consider whether the State made any attempt to

23

discover the unknown information by asking the potential jurors additional questions. *Harris*, 129 Ill. 2d at 188; *Smith*, 236 Ill. App. 3d at 815.

¶ 65       Here, the State made no attempt to engage Jackson or Love-Fisher in questioning to determine how well they knew defendant or his family members. For example, the prosecutor never asked Love-Fisher how long ago her son played football with defendant or if she had any contact with defendant since then. With respect to Jackson, the State never determined which members of defendant's family Jackson went to school with, how long ago he went to school with them, or if he was still in contact with them. As a result, the prosecutor's suggestion that Jackson might "have to explain to the family his decision" if he and the rest of the jury convicted defendant was based on pure speculation and not a race-neutral reason to exclude him from the jury. See *People v. Mays*, 254 Ill. App. 3d 752, 763 (1993) (State's proffered race-neutral reason for striking a potential black juror is improper if it is speculative).

¶ 66       At the postjudgment hearing on defendant's motion for a new trial, the prosecutor explained that he did not ask more questions to Jackson or Love-Fisher in an attempt to "dive into" their relationships with defendant because he was concerned that a response from a potential juror might "influence the rest of the jury." Such an explanation is insufficient to overcome defendant's *prima facie* showing of racial discrimination because "the same arguments could be made about virtually any question tendered during *voir dire*." *People v. Harris*, 164 Ill. 2d 322, 354 (1994) (J. Harrison, dissenting). "[E]very question holds the uncertainty of an unexpected response." *Id.* "If we knew what the answers would be and how other jurors would respond to them, there would be no point to *voir dire* at all." *Id.* Allowing the State to insufficiently question potential jurors and then challenge them based on a lack of information renders *Batson* meaningless. See *Harris*, 129 Ill. 2d at 188; see also *People v.*

24

*Bradshaw*, 2020 IL App (3d) 180027, ¶¶ 40-41 (State's failure to clarify an issue bolsters the defendant's argument that the State's reason for dismissing a black potential juror was pretextual). Because the State failed to fully and thoroughly question Jackson and Love-Fisher about their relationships with defendant and/or his family, the State failed to rebut defendant's *prima facie* showing that the State excluded them based on race.

¶ 67    In light of the foregoing, I believe the trial court's finding that the State's reasons for exercising peremptory challenges to remove all three potential black jurors from the jury were race neutral was clearly erroneous. I would, therefore, reverse defendant's conviction and remand for a new trial.